ATTORNEYS FOR APPELLANT
Steven E. Ripstra
Ripstra Law Office
Jasper, Indiana

Thomas A. Dysert
Petersburg, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

**FILED**
Feb 18 2015, 11:04 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 10S00-1307-DP-492

JEFFREY A. WEISHEIT,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Clark Circuit Court, No. 10C01-1008-MR-00601
The Honorable Daniel E. Moore, Judge

On Direct Appeal from a Sentence of Death

**February 18, 2015**

**David, Justice.**

Jeffrey Weisheit was convicted of murdering eight-year-old Alyssa Lynch and five-year-old Caleb Lynch and of arson resulting in serious bodily injury. In accordance with the jury's recommendation, the trial court sentenced him to death. On direct appeal, he claims that the trial court erred in excluding a prison administration expert from testifying that he could be safely housed in prison for the remainder of his natural life, and he raises issues related to the sufficiency

of the evidence underlying his convictions, the denial of for-cause challenges during jury selection, an unauthorized communication with the jury, the suppression of statements he made to police, his death sentence, and the consideration of mitigating circumstances. After careful review, we affirm Weisheit's convictions and sentence.

## Facts and Procedural History

Early in the morning of April 10, 2010, the German Township Fire Department arrived at Weisheit's Evansville, Indiana home, which was engulfed in flames. After the fire was extinguished, investigators found the bodies of eight-year-old Alyssa Lynch and five-year-old Caleb Lynch. The children and their pregnant mother Lisa Lynch, Weisheit's girlfriend, had been living with Weisheit since 2008. On the night of the fire, Weisheit was home with the children while Lisa worked.

Alyssa was found in a closet, where she had either been trapped inside or attempted to flee the fire. Over ninety percent of her body was charred black, and a pathologist thought it possible that she burned while she was still alive or as she asphyxiated to death from soot and smoke inhalation. She likely experienced a sensation similar to drowning in her final moments.

Also charred beyond recognition, Caleb was found on his mattress, hog-tied with duct tape and with a twelve-inch-by-twelve-inch washcloth stuffed in his mouth and secured by duct tape. A railroad flare had been placed in his underwear, and another railroad flare was found under his body. The flare in his underwear burnt his left thigh while he was still alive and conscious. He died in agony of suffocation from soot and smoke inhalation.

The previous day, Weisheit quit his job and withdrew all of the money in his bank account. Earlier in 2010, he stopped paying for the engagement ring that he had placed on layaway and communicated to two co-workers plans to harm Lisa, reportedly because he may have doubted that the unborn child was his. He talked of going out "[i]n a blaze of glory." (Tr. at 1596.)

When the fire department arrived at his house at 3:45 a.m. the morning of the fire, Weisheit was not home. He failed to respond to numerous calls to his cell phone. OnStar placed him in Boone County, Kentucky. When an OnStar operator placed a call from Lisa to his car, Weisheit refused to speak with Lisa.

Boone County sheriff deputies located Weisheit in traffic, but he fled at speeds exceeding 140 miles per hour. Eventually, spike strips brought Weisheit's car to a stop. Confronted by officers, he pulled out a knife and aggressively jumped around while screaming "come on, f***ing kill me . . . I want to die." (Tr. at 1357–58.) Weisheit then threw the knife at the officers, narrowly missing one. Refusing to submit, Weisheit was tased and fell to the ground, hitting his head. At the time of his capture, he was carrying $4,800 in cash and two rolls of duct tape, and he had clothing and toiletries in his car.

Taken to the hospital, Weisheit was diagnosed with a mild brain contusion or concussion. While at the hospital, Vanderburgh County detectives read Weisheit his Miranda rights before conducting a nineteen-minute interview. During the interview, Weisheit answered some questions but, when asked about the fire or the children, pretended to fall asleep.

Based on the totality of the circumstances, State Fire Marshal Clayton Kinder determined that the fire had been intentionally set.

The State subsequently charged Weisheit with two counts of murder[1] and with class A felony arson resulting in serious bodily injury.[2] Alleging as aggravating circumstances that: (1) Weisheit committed multiple murders; and (2) his victims were less than twelve years old, the

---

[1] Ind. Code § 35-42-1-1(1) (2008).

[2] Ind. Code § 35-43-1-1(a) (2008).

3

State sought the death penalty pursuant to Indiana Code §§ 35-50-2-9(b)(8) and 35-50-2-9(b)(12) (2008).

At trial, Weisheit testified and admitted to binding Caleb with duct tape and shoving a washcloth into his mouth because he was angry with the boy—who was repeatedly apologizing— for refusing to go to bed. According to Weisheit, he placed Caleb on his bed, thought to himself that "I got to get out of here," and packed his clothes—as well as some of Lisa's belongings, such as her jewelry—in order to "get away . . . from everything for a day or so." (Tr. at 2028.) He testified that he left his house around 1 a.m. He also admitted to bringing flares into the house at an earlier time.

On June 18, 2013, a jury found Weisheit guilty of murdering Alyssa and Caleb and of class A felony arson resulting in serious bodily injury. Finding that, under Indiana Code § 35-50-2-9(l), the State had proven the alleged aggravating circumstances beyond a reasonable doubt, and that these aggravating circumstances outweighed any mitigating circumstances, the jury recommended the death penalty. The trial court sentenced Weisheit accordingly.

Pursuant to Indiana Appellate Rule 4(A)(1)(a), this Court has mandatory and exclusive jurisdiction over Weisheit's appeal of his convictions and death sentence. Additional facts will be provided as necessary.[3]

---

[3] We note that this is only the second death penalty direct appeal before this Court in the past five years. Indiana is one of thirty-two states with the death penalty, and currently fourteen people are on death row in Indiana. See *States With and Without the Death Penalty*, DEATH PENALTY INFORMATION CENTER, http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited February 18, 2015); and *State by State Database*, DEATH PENALTY INFORMATION CENTER, http://www.deathpenaltyinfo.org/state_by_state (last visited February 18, 2015). Indiana's death penalty statute was last revised in 2014. Ind. Code § 35-50-2-9 (effective July 1, 2014).

**Issues Raised**

First, Weisheit claims that the trial court committed reversible error in excluding, during the penalty phase, a prison administration expert's testimony that he could safely be incarcerated for the rest of his natural life. Second, Weisheit contends that there is insufficient evidence to sustain his conviction for arson resulting in serious bodily injury. Third, Weisheit argues that the trial court committed reversible error in refusing to excuse twelve jurors for cause. Fourth, Weisheit insists that he was entitled to a mistrial after a juror placed a note from his wife in the jury room stating "Thank you for your service for the family of Alyssa [and] Caleb Lynch. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!" (Court's Ex. 1.)

Fifth, Weisheit asserts that there is insufficient evidence to support his convictions for murder. Sixth, Weisheit maintains that the statements he gave to police while hospitalized for a mild brain contusion were made involuntarily and therefore should have been suppressed. Seventh, Weisheit asks this Court to remand his case to the trial court for a new sentence. Eighth and finally, Weisheit urges that his death sentence be vacated because neither the jury nor the trial court properly considered and weighed his offered mitigating circumstances. We will take each in turn.

**Standard of Review**

Following the entry of judgment, before a death sentence can be imposed, the State must prove beyond a reasonable doubt at least one aggravating circumstance listed in subsection (b) of the death penalty statute. Ind. Code § 35-50-2-9(a); Krempetz v. State, 872 N.E.2d 605, 613 (Ind. 2007). In making its sentencing determination, the trial court must find not only that the State has proven the existence of an alleged aggravator beyond a reasonable doubt, but also that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. Ind. Code § 35-50-2-9(l); Krempetz, 872 N.E.2d at 613.

5

We have mandatory and exclusive jurisdiction over a criminal appeal where the defendant is sentenced to death. Ind. Appellate Rule 4(A)(1)(a). However, our standard rules of appellate review apply in death penalty cases. Matheney v. State, 583 N.E.2d 1202, 1208 (Ind. 1992) (citing Games v. State, 535 N.E.2d 530, 537 (Ind. 1989)).

## I.      The Trial Court Did Not Err in Excluding a Prison Administration Expert's Testimony that Weisheit Could be Safely Incarcerated in Prison

As mitigation evidence against the death penalty, Weisheit sought to present testimony from James Aiken, an expert in prison administration and inmate classification, that he could "adequately be housed, managed, and supervised, and secured in a high security setting for the remainder of his life without causing undue risk of harm to staff, inmates or the general public," or alternatively incarcerated for a term of years. (Tr. at 2373, 2379.) In preparation for his testimony, Aiken reviewed Weisheit's records from the Vanderburgh County Confinement Center, where Weisheit was being housed, interviewed Weisheit the previous night, and drew upon his forty years of experience working in corrections.

Objecting to the potential admission of Aiken's testimony, the State argued that, based on Aiken's limited interaction with Weisheit, Weisheit had not laid the proper foundation for Aiken to testify as to his prediction of Weisheit's future behavior. Additionally, the State pointed out that Aiken could not support his proposed testimony with scientific studies or a course of study.

Agreeing with the State that Aiken's proposed testimony was too speculative to be admissible, the trial court prohibited Aiken from testifying to his opinions regarding Weisheit's potential future classification in the Indiana Department of Correction. However, the trial court did permit Aiken to testify as to Indiana's classification system in general and his knowledge about Weisheit's housing and classification up to the time of the penalty phase. After making an offer of proof, Weisheit decided that there was no purpose to having Aiken testify as to the classification system and declined to call Aiken as a witness.

6

Whether the trial court erred in excluding expert testimony about Weisheit's future ability to adjust to prison life in a capital case is an issue of first impression before this Court. Indeed, our precedent addresses the admissibility of evidence of a defendant's *past* adjustment to prison life—not expert testimony of *future* predicted adjustment. We review the trial court's decision to exclude such evidence for an abuse of discretion. Hardiman v. State, 726 N.E.2d 1201, 1203 (Ind. 2000).

In Wilkes v. State, we held that trial courts are "required to consider all evidence relevant to mitigation, which . . . includes evidence of positive adjustment to incarceration." 917 N.E.2d 675, 690 (Ind. 2009). See also Skipper v. South Carolina, 476 U.S. 1, 4–5 (1986) (holding that evidence of positive adjustment to prison life must be considered in a capital case). But the trial court "is not obligated to accept the defendant's contentions as to what constitutes a mitigating circumstance or to give the proffered mitigating circumstances the same weight the defendant does." Wilkes, 917 N.E.2d at 690 (citing Gross v. State, 769 N.E.2d 1136, 1140 (Ind. 2002)). Nor is the trial court required to accept the opinion of experts. Wilkes, 917 N.E.2d at 690 (citing Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004)). Thus, "it is not reversible error to fail to consider a factor that is not significant in relation to all the circumstances of the case." Wilkes, 917 N.E.2d at 690.

Weisheit correctly cites Skipper as recognizing that error would ensue if the trial court precluded the defendant from "introducing otherwise admissible evidence for the explicit purpose of convincing the jury that [he] should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment." (Appellant's Br. at 27–28 (citing Skipper, 476 U.S. at 7)). However, his reliance on Skipper and related precedent is misplaced, for neither Skipper nor Wilkes involved expert testimony projecting the defendant's likelihood of future positive adjustment to imprisonment. In reality, Skipper and Wilkes stand for requiring the admissibility of otherwise admissible evidence about a defendant's past or current adjustment to incarceration—not evidence of projected future adjustment. See Wilkes, 917 N.E.2d at 690. Accordingly, the question before us is distinct.

7

To be sure, had Aiken (or another expert) been prepared to testify as to Weisheit's adjustment to imprisonment throughout the time *leading up to* the penalty phase, then the trial court's exclusion of such testimony—assuming the proper foundation had been laid and it was otherwise admissible—would have been problematic and could have possibly resulted in reversal of his death sentence. But Weisheit offered Aiken's testimony as evidence of his *future* ability to be safely imprisoned. For all his knowledge and expertise in classifying inmates, Aiken is not an expert in predicting future behavior. See Galloway v. State, 122 So.3d 614, 642 (Miss. 2013), cert. denied ("speculative opinion testimony of how a defendant may adapt to prison life in the future is not admissible unless the expert is qualified and accepted in the field of predicting future behavior") (internal citation omitted). Because Weisheit's offer of proof was testimony as to his future behavior from someone who was not an expert in the field of predicting an individual's future behavior, the trial court did not abuse its discretion in excluding Aiken's proposed testimony as too speculative.

Further, we note that Weisheit did not help his case by failing to make a more precise offer of proof regarding Aiken's prediction of his specific future classification when the trial court held a significant discussion outside the presence of the jury about the admissibility of Aiken's potential testimony. At no time during this discussion did Weisheit's counsel make a clear offer of proof by requesting permission from the trial court to ask Aiken a series of questions that counsel intended to ask at trial. Perhaps if Aiken had made a detailed prediction as to Weisheit's potential classification, and if Weisheit had established that Aiken had adequate qualifications and experience in predicting inmates' future behavior (beyond the prediction inherent in classifying

8

inmates), then we may not have agreed with the trial court that Aiken's potential testimony was speculative and thus inadmissible.[4]

## II.    Sufficient Evidence Supports Weisheit's Arson Conviction

Next, Weisheit contends that because there was no direct evidence that he started the fire, his conviction for class A felony arson resulting in serious bodily injury was impermissibly based upon a series of inferences and therefore not supported by sufficient evidence. To properly convict Weisheit of class A felony arson resulting in serious bodily injury under Indiana Code § 35-43-1-1(a), the State was required to prove beyond a reasonable doubt that: (1) Weisheit; (2) by means of fire, explosive, or destructive device; (3) knowingly or intentionally damaged; (4) property under circumstances that endangered human life; (5) resulting in serious bodily injury to any person other than Weisheit.[5]

When reviewing a challenge of insufficient evidence to sustain a conviction, we

> consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. . . . Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. [T]he

---

[4] See Lawlor v. Commonwealth, 738 S.E.2d 847, 883–84 (Va. 2013), cert. denied (finding that evidence of a defendant's future adaptability to imprisonment must be "personalized to the defendant based on his specific, individual past behavior or record").

[5] Now, such an offense is a Level 3 felony if it results in bodily injury to any person other than a defendant and a Level 2 felony if it results in serious bodily injury to any person other than a defendant. Ind. Code § 35-43-1-1(a) (effective July 1, 2014).

> evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

Meehan v. State, 7 N.E.3d 255, 257 (Ind. 2014) (quoting Drane v. State, 867 N.E.2d 144, 146–47 (Ind. 2007)) (internal citations omitted). As Weisheit correctly recognizes, a conviction cannot be sustained when "an essential element of an offense necessary in the proof of the offense and to sustain a verdict of guilty . . . is founded solely and wholly upon another inference." Landress v. State, 600 N.E.2d 938, 942 (Ind. 1992) (citing Smith v. State, 200 Ind. 411, 414, 164 N.E. 268, 269 (1928)). This is because "the probability of a given inference being accurate decreases with each inferential building block." Landress, 600 N.E.2d at 942.

Contrary to Weisheit's argument, this is *not* a case where guilt was based on inference upon inference. Rather, the jury concluded that he committed arson resulting in serious bodily injury based upon a series of independent facts, among them:

- A few months before the fire, Weisheit told a co-worker that if he found out that Lisa was having an affair, he would kill her, then kill himself and "burn everything" (Tr. at 1611.);
- Weisheit told another co-worker that "if he had to get rid of [Lisa] he could. He could pull teeth, cut fingers off, put her in a place nobody would find her." (Tr. at 1596.) He said if he were to leave, he would go out "[i]n a blaze of glory" (Tr. at 1596.);
- Weisheit admitted to being very upset that Lisa was pregnant and questioned if the child was his;
- In late March 2010, Weisheit cancelled the layaway plan he was using to purchase an engagement ring for Lisa and told the jewelry store manager that Lisa and he had broken up and that he was going to leave the country;
- Weisheit admitted that he brought railroad flares into the house and was going to work at a railroad the next day;
- The day before the fire, Weisheit quit his job and withdrew all of the money in his bank account;

- Weisheit admitted that on the night of the fire, because Caleb did not want to go to bed, he hog-tied the boy and stuffed a twelve-inch-by-twelve-inch washcloth into his mouth;

- Weisheit admitted that on the night of the fire he left the house alone with one child hog-tied and duct taped;

- Weisheit fled the state the night of the fire;

- As he fled, Weisheit did not answer numerous phone calls and refused to speak with Lisa when OnStar contacted him on her behalf;

- Weisheit fled police at speeds exceeding 140 miles per hour;

- When surrounded by police, Weisheit implored the officers to shoot, threw a knife at officers, and had to be tased into submission;

- Weisheit had $4,800, clothes, toiletries, and Lisa's jewelry in his possession when he was taken into custody;

- At the hospital, Weisheit selectively answered certain questions but pretended to be asleep when asked about the fire or the children's whereabouts;

- One burnt flare was found stuffed in Caleb's underwear and another was recovered under his body;

- Fire Marshall Kinder concluded that, based on the totality of the circumstances, the fire that killed Alyssa and Caleb Lynch was started intentionally.

Although no fact independently proves Weisheit's guilt, none of these facts depends upon another for its validity.[6]  Each of these facts, and others not listed, are stand-alone pieces of evidence that collectively establish Weisheit's guilt beyond a reasonable doubt. Considering these facts together, the jury could have reasonably inferred that Weisheit intentionally started the fire

---

[6]  Neither are we persuaded by Weisheit's argument that his conviction is unsupported by sufficient evidence because the State did not present direct evidence that he started the fire.  Almost all arson convictions are based on circumstantial evidence, given the nature of the crime.  See Barton v. State, 490 N.E.2d 317, 318 (Ind. 1986.)

that resulted in the children's deaths. Finding more than sufficient evidence to sustain Weisheit's conviction for class A felony arson resulting in serious bodily injury, we will defer to the jury's determination. See Barton v. State, 490 N.E.2d 317, 318 (Ind. 1986).

### III.    The Trial Court Did Not Err in Refusing to Excuse Twelve Jurors For Cause

During jury selection, Weisheit challenged several potential jurors for cause based on their views of the death penalty. The trial court granted some of his challenges but denied twelve others. Using peremptory challenges to remove these prospective jurors, Weisheit exhausted all of his allotted peremptory challenges, plus an additional peremptory challenge granted by the trial court, before the last juror was seated. As a result, he had no peremptory challenges remaining when the trial court denied his final for-cause challenge and seated a juror he wanted excused. Arguing that the trial court abused its discretion when it refused to dismiss the twelve potential jurors for cause, thereby forcing him to exhaust all of his peremptory challenges in striking those potential jurors from the panel and accept a juror he did not want seated when his challenges ran out, Weisheit originally asserted that he is entitled to a new trial. Crucially, as the State points out, Weisheit does not allege that an actual juror was biased and should have been dismissed for cause.

Our recent holding in Oswalt v. State, 19 N.E.3d 241 (Ind. 2014), handed down after Weisheit filed his appellate brief, is dispositive of this issue. In Oswalt, we further examined Indiana's "exhaustion rule," under which parties may seek appellate review of for-cause challenges to prospective jurors only if they have exhausted their peremptory challenges, as Weisheit did here. See Oswalt, 19 N.E.3d at 246. Ultimately, we explained that:

> The exhaustion rule requires parties to peremptorily remove jurors whom the trial court refuses to strike for cause or show that they "had already exhausted [their] allotment of peremptories" at the time they request for-cause removal. [Whiting v. State, 969 N.E.2d 24, 30 (Ind. 2012).] And "even where a defendant preserves a claim by striking the challenged juror peremptorily," an appellate court will find reversible error "only where the defendant eventually

12

> exhausts all peremptories *and is forced to accept either an incompetent or an objectionable juror*." Id.

Oswalt, 19 N.E.3d at 246 (emphasis added). "A juror who qualifies for removal under . . . constitutional or statutory criteria may be removed as an 'incompetent juror,' while a juror 'who is not removable for cause but whom the party wishes to strike' peremptorily is termed 'objectionable.'" Id. at 246 (quoting Whiting, 969 N.E.2d at 30 n.7.).

Though Weisheit satisfied the exhaustion rule by exhausting his peremptory challenges, he does not establish that an "objectionable" juror served on his jury. He neither identifies which particular juror(s) were objectionable nor explains why he wished to strike the juror(s); he simply states that in expending all of his peremptory challenges, he "was forced to accept other jurors who, although not necessarily positioned to be challenged for cause, were biased against his evidence in either the guilt phase, the penalty phase, or both." (Appellant's Br. at 49.) Under Oswalt, his conclusory assertion that he was forced to accept biased jurors is not nearly enough for us to find reversible error. At oral argument, Weisheit conceded as much. Accordingly, Weisheit cannot demonstrate, and no longer argues, that the trial court abused its discretion in refusing to excuse twelve jurors for cause.

**IV.    Weisheit is Not Entitled to a Mistrial after a Juror Placed a Note in the Jury Room Thanking Jurors for their Service to the Deceased**

On the first day evidence was heard at Weisheit's trial, it was discovered that Juror Number 10 had delivered cookies to the jury room baked by his wife. Attached, she had taped a note that said "Thank you for your service for the family of Alyssa [and] Caleb Lynch. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!" (Court's Ex. 1.) Upon learning of the note, the trial court and counsel for both parties convened in chambers, on the record. The trial judge stated that he wanted to bring the jurors into chambers individually and ask them whether they had seen the note. Counsel for both parties agreed to this course of action. The trial court and counsel then, on the record, questioned each juror individually about the note's

13

effect, if any, on them. Of the fifteen jurors and alternates, four were unaware of the note, five were aware of the note but had not read it, and the remaining six recalled that the note thanked them for their jury service. Each stated that the note had no effect on them.

When Juror Number 10 was asked about the note in chambers, he responded that "I don't even know what the note said, I never read it. . . . the guys told me . . . it said thanks for your service . . . I didn't know she was going to write a note. I knew she was going to cook cookies." (Tr. at 1700–01.) He adamantly agreed with the State that his wife was not attempting to influence the jury through her actions. After the trial court finished questioning him, Juror Number 10 returned to the courtroom and was overheard by others, including fellow jurors, as stating "That's ridiculous," or words to that effect, a few times aloud to himself. (Tr. at 1789–91.)

Following the trial court's and counsels' individual examinations of jurors and alternates, and outside the presence of the jury, Weisheit moved for a mistrial, arguing that the note place him in grave peril. Denying his motion, the trial court explained that after conducting the interviews he was satisfied that the note had no impact on the jurors and alternates and was in fact perceived by them to be "innocent." (Tr. at 1730–31.) The trial court did, however, remove Juror Number 10 from the jury and replace him with Alternate Juror 1. Additionally, the trial court admonished the jury "to consider this case and your decision making in this case based only on the evidence you hear out here in the courtroom" and reminded the jurors that "communication should not be brought into the jury room." (Tr. at 1732–33.)

The following day, the trial court heard additional arguments outside the presence of the jury on Weisheit's motion for a mistrial. Referencing Juror Number 10's prior experience of serving on a jury in a capital case as well as his early placement on the current panel, Weisheit contended that the recently dismissed juror was an "important constituent" of the jury panel who enjoyed a position of "expertise and influence" on the jury—and therefore implied that his actions made a fair trial for Weisheit impossible. (Tr. at 1915.) Concluding that his decision to remove Juror Number 10 from the panel was correct and furthermore that the note did not place Weisheit in a position of grave peril, the trial court once more denied Weisheit's motion for a mistrial.

14

Weisheit also calls our attention to two other incidents involving the jury. During voir dire, an anonymous call was placed to Weisheit's counsel informing them that Juror Number 2 was talking to family members about the case, declaring that he would vote guilty no matter what, and expressing that Weisheit should be shot in the head. In chambers and on the record, and with the agreement of both parties, the trial court conducted an inquiry of Juror Number 2. Under oath, Juror Number 2 denied making these statements and denied speaking with others about the facts of the case.

After the trial court finished questioning Juror Number 2, Weisheit requested that he be dismissed. The trial court did not make an immediate decision but decided to instruct the sheriff to investigate the source of the phone call and to locate potential witnesses to Juror Number 2's comments. When the trial court returned to the jury and potential jurors after a short recess, he admonished them "not [to] discuss the case or what you've heard about the case." (Tr. at 740–41.) The trial court continued:

> Mr. Weisheit is presumed to be innocent as the trial starts. And if you serve as a jury member, it's your job to determine whether or not the State has met its burden of proof. That's how the law works and that's how it must work in this case too. So jumping the gun in either your thought process or your conversations would be detrimental to the law and to the process that we want to use here.

(Tr. at 741.)

Later that day, outside the presence of the jury, the trial court, with counsel present, examined under oath the witness to Juror Number 2's comments. The witness admitted to making the anonymous call and confirmed that five days earlier Juror Number 2 had stated that he would vote guilty and that Weisheit ought to be shot. Once more, the trial court questioned Juror Number 2, who continued to deny making the comments. Finding Juror Number 2 untruthful, the trial court removed him from the jury and cited him for contempt. There is nothing in the record to indicate that other jurors or potential jurors were aware of Juror Number 2's comments.

Another incident occurred during voir dire, when Juror Number 66 stated that he had heard that Weisheit admitted to starting the fire. He also stated that he had already formed a definite opinion about Weisheit's guilt. Juror Number 66 was not selected for the jury, and based on his statements Weisheit moved to strike the entire voir dire panel for prejudice because "[y]ou can't unring the bell." (Tr. at 51.) Though the trial court denied Weisheit's motion to strike, it did address the jury:

> I want to be sure that you understand everything that we've said so far and that all of you have said so far is not associated with any particular party, isn't proof of any fact one way or the other. We have gone through some introductory comments, I've asked you questions from the bench, you've given statements back to me. Until the evidence actually begins these preliminary matters are not to be considered by any of you as having any evidentiary weight one way or the other.

(Tr. at 52.) During preliminary instructions, the trial court further informed the jury, among other things, that "[y]our decision must be based on the evidence presented during this trial and my instructions on the law." (Tr. at 1111–12.)

On appeal, Weisheit argues that, taken together, these three incidents "subjected [him] to a grave peril to which he should not have been subjected." (Appellant's Br. at 57 (citing White v. State, 257 Ind. 64, 78, 272 N.E.2d 312, 319–20 (1971)).) He maintains that he is entitled to a mistrial to remedy this series of alleged juror improprieties.

Because the trial court evaluates first-hand the relevant facts and circumstances at issue and their impact on the jury, it is in the best position to evaluate whether a mistrial is warranted. Ramirez v. State, 7 N.E.3d 933, 935 (Ind. 2014). We accordingly review the trial court's denial of a motion for a mistrial for an abuse of discretion. Id. (citing Gregory v. State, 540 N.E.2d 585, 589 (Ind. 1989)). However, the correct legal standard for a mistrial is a pure question of law, which we review de novo. Ramirez, 7 N.E.3d at 935.

16

Defendants seeking a mistrial for suspected jury taint from improper extra-judicial communications "are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury."  Id. at 939 (citing Currin v. State, 497 N.E.2d 1045, 1046 (Ind. 1986)).  If the defendant makes both showings, "[t]he burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless."  Ramirez, 7 N.E.3d at 939.  If the State does not rebut this presumption, then the trial court must grant a new trial.  Id.

Here, Weisheit meets both of his required showings by a preponderance of the evidence, as he establishes that: (1) Juror Number 10's wife communicated with jurors and alternate jurors without authorization via the note; (2) about the matter before the jury.  Though the note did not reference the ultimate issue that the jury was called to decide—Weisheit's guilt—the note spoke in the most general sense to the jury's deliberations.  Therefore, under Ramirez the burden shifts to the State to show that the note's message was harmless.

We agree with the trial court that the State successfully rebutted the presumption of prejudice to Weisheit from the note by showing that its contents were harmless and that the note had no influence on the jury.  As the State emphasizes, over half of the jurors did not read the note, and the jurors who did read the note stated that it had no effect on their ability to serve impartially.  This is unsurprising, as the note merely offered encouragement and gratitude for the jury's no doubt difficult job ahead and made no mention of Weisheit at all.  Moreover, Weisheit did not present any evidence that the jurors believed the note was an attempt to inappropriately influence them.

Thanks to the proactive efforts of the trial court of individually questioning each juror and issuing an admonishment, it was quickly determined that the note's message would not affect the ability of the jurors and the alternate jurors to keep an open mind throughout the presentation of evidence, and the juror who brought in the note and minimized its presence was dismissed.  Because Weisheit was not prejudiced by the extra-judicial communication, the trial court was well

17

within its discretion to deny his motion for a mistrial. Nor is Weisheit entitled to a mistrial on the basis of cumulative juror impropriety, as once again under Oswalt he fails to argue that an actual juror was biased.

### V. Sufficient Evidence Supports Weisheit's Murder Convictions

As he set forth in his argument that insufficient evidence sustains his conviction for class A felony arson resulting in serious bodily injury, Weisheit contends that without direct evidence that he started the fire that killed the children, his murder convictions are likewise impermissibly based upon a chain of inferences. He adds that his conduct the night of the fire constituted, at most, "reckless indifference." (Appellant's Br. at 59.)

To prove that Weisheit was guilty of murder, the State had to establish beyond a reasonable doubt that: (1) Weisheit; (2) knowingly or intentionally; (3) killed; (4) another human being. Ind. Code § 35-42-1-1. For the reasons we listed in Section II, we find that the jury could have reasonably inferred that Weisheit intentionally killed Alyssa and Caleb Lynch. See Meehan, 7 N.E.3d at 257. Thus, sufficient evidence underlies his murder convictions.

### VI. The Trial Court Did Not Err in Admitting Weisheit's Statements to Police into Evidence

After Weisheit was tased by police, he fell to the ground, hit his head, and sustained a mild brain contusion or concussion. Weisheit was transported to a hospital, where after acknowledging his Miranda rights, he was questioned by Vanderburgh County police in the hours after his arrest.[7]

---

[7] The record is unclear as to the exact amount of time that elapsed between Weisheit striking his head on the ground and the police interview. However, an ambulance was dispatched for Weisheit at 7:38 a.m.

During the interview, Weisheit stated that he had left his house the previous night "for good," with the children home in bed. (State's Ex. 1A at 6–7, 10.) He said he did not remember what happened at his house.

When an officer asked "How did you set the fire?" Weisheit answered "I don't know." (State's Ex. 1A at 9.) Similarly, when an officer implored Weisheit to tell him what happened to the children, Weisheit stated "I don't remember." (State's Ex. 1A at 11.) At other times, Weisheit was unresponsive when asked "[w]hat happened with Caleb and Alyssa" or "[c]an you tell us anything about the house fire" and pretended to be asleep. (State's Ex. 1A at 5, 8; Tr. at 1765–66.) Still at other times, he readily responded. For example, he gave his address ("10040 Fisher Road"), the reason he packed his possessions in his car ("leaving for good"), and his motivation for quitting his job ("the foreman giving jobs to other people that's just cause they take him fishing and everything else"). (State's Ex. 1A at 2, 10, 17.) He also told the officers that he last saw the children at 8:00 p.m. the previous night after putting them to bed. In all, the interview lasted nineteen minutes and ended when Weisheit requested counsel.

Before trial, Weisheit filed a motion to suppress his statements to the police as involuntary. The trial court denied his motion, finding that Weisheit was "alert and oriented," that the officers conducting the interview "[did] not demonstrate any coercive, or overbearing conduct," and consequently that the State met its high burden of proving beyond a reasonable doubt that Weisheit's statements were voluntarily given. (App. at 218–19.) Later, the trial court overruled Weisheit's objection to admission of the statements into evidence at trial.

On appeal, Weisheit maintains that, given his medical condition, his statements were involuntarily made and should have been suppressed. He compares his case to <u>Mincey v. Arizona</u>,

EST, and one of the participating detectives testified that he arrived at the hospital to interview Weisheit around 11:30 a.m.–12:00 p.m. EST, so we can infer that approximately four to four-and-a-half hours passed.

where the defendant was in an intensive care unit severely wounded from a gunshot wound, in "unbearable" pain, and unable to speak coherently when police interviewed him about the murder of a police officer. 437 U.S. 385, 398–99 (1978). As he vacillated in and out of consciousness, Mincey repeatedly expressed that he did not want to talk without an attorney present. Id. at 399. Nevertheless, an officer persisted in his questioning and after several hours was able to obtain statements from Mincey. Id. at 396. Determining that Mincey's weakness from pain and shock and his isolation from family, friends, and legal counsel led to his will being overborne by police, the U.S. Supreme Court determined that his statements were involuntary and thus inadmissible against him. Id. at 401–02.

Contrary to Weisheit's assertion, there is no comparison between the facts in Mincey and the circumstances before us. Unlike Mincey, Weisheit had sustained only a minor injury and remained conscious throughout the brief interview. He was fully aware of his surroundings, selectively responded to certain questions in great detail, and—critically—his request for counsel was immediately honored by the interviewing officers. Clearly, the circumstances in Mincey were exponentially more egregious than those present before us.

Unlike under the Federal Constitution, where the prosecution must prove a statement's voluntariness by the preponderance of the evidence, under Indiana law the State must prove beyond a reasonable doubt that a statement is voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972); Wilkes, 917 N.E.2d at 680. As we explained in Wilkes:

> [i]n evaluating a claim that a statement was not given voluntarily, the trial court is to consider the "totality of the circumstances," including any element of police coercion; the length, location, and continuity of the interrogation; and the maturity, education, physical condition, and mental health of the defendant. To determine that a statement was given voluntarily, the court must conclude that inducement, threats, violence, or other improper influences did not overcome the defendant's free will.

20

Id. (internal citations omitted). The trial court's determination of voluntariness is reviewed as a sufficiency of the evidence question. Id. We will not reweigh the evidence. Id. If the trial court's finding of voluntariness is supported by substantial evidence, we will affirm. Id.

Here, we find that the following evidence, among others, supports the trial court's rulings: (1) Weisheit had only a mild brain contusion; (2) the on-site examining physician testified that Weisheit was alert and oriented at the relevant time; (3) another physician testified that Weisheit was capable of understanding and participating in his conversation with police; (4) no drugs other than anti-nausea medication had been administered to Weisheit; (5) the officers conducting the interview testified that Weisheit selectively feigned sleep based on the subject matter of their questions but was otherwise responsive; and (6) the interview was relatively brief in duration and ceased when Weisheit asked for an attorney—in itself evidence that he understood his Miranda rights and was thus aware of his surroundings. (App. at 212–16; Tr. at 1765–66; State's Ex. 1A at 5, 8.)

We find that this is substantial evidence establishing that, under the totality of the circumstances, Weisheit voluntarily made his statements to police. Weisheit calls our attention to other conflicting evidence, but this is merely an invitation for us to reweigh the evidence in his favor, which we will not do. Accordingly, and despite a standard more favorable to the defendant, on careful review we affirm the trial court's finding that the State proved the statements' voluntariness beyond a reasonable doubt.

## VII.     The Trial Court Did Not Abuse Its Discretion in Sentencing Weisheit to Death in Accordance with the Jury's Recommendation

In his appellate brief, Weisheit argued that we should revise his death sentence under Indiana Appellate Rule 7(B), which permits an appellate court to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Against the

advice of his counsel, Weisheit then submitted a request to strike the following from the conclusion of his brief:

> For the reasons set forth . . . above, the Appellant-Weisheit prays that this Court:
>
> . . .
>
> E. Modify Appellant's sentence to a sentence less than Death, or Remand the Cause to the trial court with an Order to hold a new sentencing hearing[.]

(Counsel's Submission of Appellant's Demand, April 29, 2014; Appellant's Br. at 75.)

Without a request to revise his sentence under Indiana Appellate Rule 7(B), Weisheit's argument is reduced to a plea to remand his case to the trial court for a new sentence. Thus, our analysis shifts from determining whether Weisheit's sentence is inappropriate given the nature of his offense and his character to discerning whether the trial court abused its discretion in sentencing Weisheit to death in accordance with the jury's recommendation.

> Sentencing is conducted within the discretion of the trial court and will be reversed only upon a showing of a manifest abuse of that discretion. It is within the discretion of the trial court to determine whether a presumptive sentence will be increased or decreased because of aggravating or mitigating circumstances.

Sims v. State, 585 N.E.2d 271, 272 (Ind. 1992). To counter the State's four alleged aggravating circumstances of multiple murders of children under the age of twelve, Weisheit offered as

22

mitigators, among other things, that: (1) he suffered from mental disorders[8]; (2) he had a minimal criminal history and no history of violence; (3) he experienced a dysfunctional home life; and (4) he had a good relationship with the Lynch family.

Our review of the record reveals no manifest abuse of the trial court's sentencing discretion. See Id. As set forth above, at trial the jury and the trial court heard overwhelming evidence of Weisheit's guilt from which they could have reasonably inferred that he committed the crimes charged. Similarly, during the penalty phase both the jury and the trial court found that the State had proven beyond a reasonable doubt that Weisheit committed multiple murders of children under the age of twelve, when only one such finding is necessary under Indiana Code § 35-50-2-9(l) to sustain a death sentence. In addition, both the jury and the trial court found that the four aggravating circumstances of multiple murders of children under the age of twelve outweighed any mitigating circumstances offered by Weisheit.

Furthermore, the trial court's sentencing of Weisheit to death in accordance with the jury's recommendation is supported by the circumstances of this case. In an act of extreme heinousness, Weisheit set fire to a house that he knew contained eight-year-old Alyssa Lynch and five-year-old Caleb Lynch. His innocent victims, one of whom he hog-tied with duct tape and gagged, spent the last moments of their young lives in torturous pain. Lisa Lynch trusted Weisheit to care for her children, and at his hands they suffered agonizing deaths. That Weisheit had been planning to murder the children and flee the state is evident from the fact that, on the day before the fire, he quit his job and withdrew all of the money in his bank account, and that on the night of the fire he packed the money along with his clothes and toiletries into his car before starting the deadly fire. And all because he apparently believed Lisa may have been unfaithful.

---

[8] Specifically, Weisheit alleged that he suffered from bipolar disorder, depression, and attention deficit hyperactivity disorder, as well as from brain trauma, delusions, and suicide attempts.

Even Weisheit concedes that the children's deaths occurred "under some of the most horrible circumstances imaginable." (Appellant's Br. at 70.) Given these well-established circumstances and the strength of the record before us, we decline to remand Weisheit's case to the trial court for a new sentence because Weisheit cannot show that the trial court manifestly abused its discretion in sentencing him to death in accordance with the jury's recommendation.

## VIII.     The Jury and Trial Court Properly Considered and Weighed Weisheit's Offered Mitigating Circumstances

Lastly, Weisheit contends that his death sentence should be vacated because neither the jury nor the trial court "gave any consideration" to the mitigating circumstances he presented. (Appellant's Br. at 70.) The trial court's sentencing order reflected that the aggravating circumstances "outweigh[ed] any mitigating circumstances put forth by the Defendant" but did not identify which mitigating circumstances, if any, had been considered in making that determination. (App. at 77.) To Weisheit, "[t]he failure to consider the mitigating circumstances is evidenced by the trial court's finding that there were none." (Appellant's Br. at 71.)

We are unpersuaded. First, Weisheit cannot cite to any authority requiring a trier of fact to list mitigating circumstances or even provide information about its consideration of alleged mitigators.[9] Our search of authority revealed just the opposite: in Pittman v. State, we stated that juries are "traditionally not required to provide reasons for their determinations," and in entering the sentence recommended by the jury "the trial court has made an independent determination according to the trial rules that there is sufficient evidence to support the jury's decision." 885 N.E.2d 1246, 1254 (Ind. 2008).

---

[9] In fact, final instruction number seven stated that no juror would be required "even to disclose what the juror believes such mitigation to be." (App. at 1258.)

Second, as the State sets forth, in both preliminary and final instructions Weisheit's jury was thoroughly instructed to consider any mitigating circumstances offered by the defendant. More precisely, the jury was told, among other things, that a mitigating circumstance could be anything the juror believed weighed against death, that mitigating circumstances did not need to be proven beyond a reasonable doubt, and that the jurors need not be unanimous in their determinations. Furthermore, the jury was informed of the statutory list of mitigating circumstances. Weisheit never asserted that the jury did not follow instructions. "When the jury is properly instructed, we will presume they followed such instructions." Duncanson v. State, 509 N.E.2d 182, 186 (Ind. 1987) (citing Tabor v. State, 461 N.E.2d 118, 125 (Ind. 1984)).

As Weisheit has failed to show otherwise, we presume the jury correctly followed instructions and considered Weisheit's alleged mitigators. Contrary to Weisheit's claim, simply because the jury and the trial court did not list any mitigating circumstances does *not* mean that they failed to consider his offered mitigators and weigh them against the four aggravators proven beyond a reasonable doubt by the State. Unable to cite authority invalidating the jury and trial court's findings that the aggravating circumstances outweighed any mitigating circumstances, Weisheit makes an unavailing final argument.[10]

## Conclusion

For the above reasons, we affirm Weisheit's convictions for murder and arson resulting in serious bodily injury and his death sentence.

---

[10] Similarly, Weisheit's claim that the trial court's sentencing order does not meet the "heightened sentencing standards" of a capital case because it did not identify mitigating circumstances lacks merit. (Appellant's Br. at 73.) The trial court is no longer required to discuss the weighing of aggravating and mitigating circumstances when a jury makes the final sentencing determination. See Pittman, 885 N.E.2d at 1253–54.

Rush, C.J., Dickson, Rucker, and Massa, J.J., concur.