## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 11 2017, 6:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael C. Borschel
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bradley Baldwin,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

May 11, 2017

Court of Appeals Case No.
49A05-1609-CR-2025

Appeal from the Marion Superior Court

The Honorable Kurt Eisgruber, Judge

Trial Court Cause No.
49G01-1501-MR-2632

**May, Judge.**

[1] Bradley Baldwin appeals his convictions of murder[1] and attempted murder.[2] Baldwin raises two issues, which we restate as:

> (1) Whether the trial court abused its discretion by excluding exculpatory evidence; and

> (2) Whether the trial court abused its discretion when it denied Baldwin's motion for mistrial based on confirmed juror misconduct.

[2] We affirm.[3]

## Facts and Procedural History

[3] Around 9 p.m. on January 19, 2015, Baldwin invited Lisa Davis[4] to use methamphetamines with him. The pair drove Baldwin's Chrysler Sebring to a "trap house"[5] at 3675 Creston Drive in Marion County. While there, Baldwin showed his revolver to Lisa and placed it on her lap. Davis described Baldwin's revolver as older, and "dark in color," with wooden grips. (Tr. Vol. 2 at 108-9.) Another person at the house, Dustin Houghton, was also in possession of a

---

[1] Ind. Code § 35-42-1-1(1) (2014).

[2] Ind. Code §§ 35-42-1-1(1) (murder) (2014), 35-41-5-1 (attempt) (2014).

[3] We held oral argument on April 20, 2017, at Tri-West High School in Lizton, Indiana. We thank counsel for their advocacy, and the students and staff of Tri-West for their warm welcome.

[4] In January 2015 when these events unfolded, Lisa's last name was Davis, but by the time of trial, she married and her name was "Lisa Neville." (Tr. Vol. 2 at 99.) To avoid confusion, we refer to her as Davis throughout this opinion.

[5] Davis agreed a "trap house" is a "place where you could go to get high." (Tr. Vol. 2 at 106.)

revolver. Houghton showed his revolver to Baldwin, who then refused to return it to Houghton. Davis believed Houghton's revolver was newer. Davis heard Houghton apologize multiple times to Baldwin and to another man at the trap house, Timothy Browers, but she did not know why he was apologizing. Baldwin's response to Houghton was to say "it's okay – it's no big deal." (*Id.* at 111.)

[4] About six hours later, the couple left the house on Creston. Baldwin asked Davis to drive his car and follow the white Chevy Cavalier in which Baldwin would ride because they were going to drop off the Cavalier. Also in the Cavalier with Baldwin were Houghton, Cecil Warner, and Ronald Scheible. Davis, driving Baldwin's car, followed the Cavalier for about "five minutes" to an alley off West Washington Street. (*Id.* at 115.) The Cavalier pulled into a parking space next to a garage, and Davis parked Baldwin's car down the alley about ten feet past where the Cavalier parked, as Baldwin had instructed her. The alley was behind a house at 114 North Belmont Avenue.

[5] After the cars parked, Baldwin and Warner exited the Cavalier and entered the house at 114 North Belmont for five or ten minutes. Houghton and Scheible remained in the Cavalier. Baldwin and Warner used some drugs with the people in the house, and Baldwin unsuccessfully attempted to trade Houghton's revolver for additional drugs. At one point, Houghton got nervous and began to drive away from the scene. When Davis saw the Cavalier back out of the parking space by the garage, she was confused because she thought they were

dropping the car off, but then Houghton parked the Cavalier in the alley behind where Davis was sitting in Baldwin's car.

[6] Baldwin and Warner left the house to return to the Cavalier, but Warner realized he had forgotten his bottle of alcohol inside the house, so he went back for it. Baldwin climbed into the Cavalier, exchanged words with Houghton, and then shot Houghton in the head with a revolver. As Warner walked toward the Cavalier a second time, he heard a shot fired, but he thought Baldwin was shooting into the air.

[7] Baldwin then told Scheible, "come on," (*id*. at 158), and the two of them exited the Cavalier and walked toward Baldwin's car. Warner sat in the front seat of Houghton's car and began talking to Houghton. Warner did not know Houghton was shot until he nudged Houghton and Houghton's head fell forward. About the time Warner realized Houghton had been shot, Baldwin was about to enter the front passenger door of Baldwin's car and Scheible was about to enter the rear passenger door of Baldwin's car. Instead, Baldwin suddenly said, "no, you ain't going nowhere neither," (*id*.), and shot Scheible. Scheible fell to the ground. Baldwin stepped over Scheible and shot him three more times. Warner testified Baldwin shot Scheible five times. Scheible rolled under a nearby car and pretended to be dead. Davis "heard some pops," (*id*. at 117), coming from behind where she was sitting in Baldwin's car, and she assumed they were gunshots, but she could not see what was happening. Baldwin then jumped into the passenger seat of his car and yelled for Davis to "go, go, go." (*Id*. at 120.)

[8] Davis and Baldwin returned to the trap house on Creston. When they arrived, Baldwin asked a resident of the home, Michael Myers, to clean the two revolvers. Myers first refused, but Baldwin continued to ask, so Myers took the guns apart, wrapped them in towels without cleaning them, and shoved them in the flu pipe of a fireplace in the basement of the house. Police and SWAT came to the house later that day to arrest Baldwin. Myers gave the police a statement of the events and showed the police where he had placed the guns.

[9] The State charged Baldwin with the murder of Houghton, the attempted murder of Scheible, and Level 4 felony unlawful possession of a firearm by a serious violent felon,[6] and it also alleged Baldwin is a habitual offender.[7] The trial court conducted a three-day jury trial. A jury found Baldwin committed all three crimes and is a habitual offender.[8]

[10] On June 1, 2016, Baldwin filed a motion for mistrial based on juror misconduct, and the trial court held a hearing thereon. The undisputed evidence is that on the evening of May 10, 2016, between the second and third days of Baldwin's trial, the juror who would be elected jury foreperson, K.W., texted friends who are licensed attorneys to ask multiple questions about the

---

[6] Ind. Code § 35-47-4-5(c) (2014).

[7] Ind. Code § 35-50-2-8(a) (2014).

[8] Although Baldwin does not challenge his sentences, we note the trial court ordered him to serve consecutive sentences of fifty years for murder, thirty years for attempted murder, and twenty years for being a habitual offender. The Sentencing Order also indicates the count of unlawful possession of a firearm by a serious violent felon was "Dismissed." (Appellant's App. Vol. 2 at 20.)

burden of proof in a criminal case and how it is defined. (*See* Appellant's App. Vol. 2 Confidential at 137-148.) When the attorney-friends found out K.W. had asked the questions because she was sitting as a juror on a case, they became very concerned that K.W.'s behavior was improper and that their talking to K.W. about legal standards while she was a seated juror could be considered unethical behavior by a lawyer. The attorney-friends therefore hired counsel and, on May 13, 2016, submitted to the Judge who presided over Baldwin's trial a letter of explanation and copies of all the text messages. At the hearing on Baldwin's motion for mistrial, K.W. testified she did not tell the other jurors about her conversation with attorney-friends, she did not use her attorney-friends' comments to influence her decisions about Baldwin, she relied on the instructions given by the trial court during deliberations, and she believed the jury rendered a fair and impartial verdict. The trial court denied Baldwin's motion for a mistrial because Baldwin was not prejudiced by K.W.'s conversations with her attorney-friends about how to define the standard of proof in a criminal case.

# Discussion and Decision

## Exclusion of Alleged Exculpatory Evidence

[11] "Trial courts have broad discretion to admit or exclude evidence, and our review is limited to whether the trial court abused that discretion." *Satterfield v. State*, 33 N.E.3d 344, 352 (Ind. 2015). A trial court abuses its discretion if its decision is "against the logic and effect of the facts and circumstances before the

court." *Jacobs v. State*, 22 N.E.3d 1286, 1288 (Ind. 2015). We may affirm the trial court on a different basis than the court ruled, as long as the court's ultimate decision was correct. *Id*. at 1290 n.3.

[12] Baldwin asserts the trial court abused its discretion by excluding exculpatory evidence, which prohibited him from presenting his defense.

> Although a defendant's right to present a defense is of the utmost importance, it is not absolute. The accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

*Id.* at 1288 (internal quotations and citations omitted).

[13] The evidence that Baldwin wanted to have admitted was evidence that, on the same night Houghton and Scheible were shot, Timothy Browers, the second man to whom Houghton had been apologizing that evening at the trap house, used a firearm to shoot at a car parked outside the trap house on Creston Drive while his girlfriend was asleep in that car. As an offer of proof, Baldwin presented testimony, outside the presence of the jury, of Detective Mark Howard who was investigating the shooting of a white Mazda on Creston Drive. Detective Howard testified Browers was the suspect in that shooting on Creston Drive, which occurred on the same night Houghton and Scheible were shot. However, Detective Howard also testified he had no information suggesting Browers was near Belmont Avenue when Houghton and Scheible were shot.

[14] The State argues the evidence of Browers shooting a gun outside the house on Creston Drive on the same night as the shootings at issue herein is not relevant to a determination of who shot Houghton and Scheible in the alley behind the house on Belmont Avenue. Evidence is "relevant" if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action.

Ind. Evidence Rule 401. If evidence is not relevant, then it "is not admissible." Evid. R. 402.

[15] The State notes there was "no evidence that Browers was present at Belmont," (Appellee's Br. at 21), and all the evidence indicated Browers possessed a semi-automatic weapon but "Houghton and [Scheible] were shot with a revolver." (*Id.*) Based on those same facts, the State also argues Detective Howard's testimony was not "exculpatory." Exculpatory evidence is evidence that tends to clear a person of alleged guilt. *Tibbs v. State*, 59 N.E.3d 1005, 1013 (Ind. Ct. App. 2016), *trans. denied*. If evidence is not relevant, it cannot be exculpatory. *Id.*

[16] In response, Baldwin notes "Scheible had testified that Mr. Browers had orchestrated or was involved in the incident at Belmont." (Br. of Appellant at 17.) Scheible did testify he believed Browers had something to do with his shooting; he also testified Browers had pointed guns at him earlier in the

evening at the trap house and he believed Browers was mad at Houghton for stopping to pick up Scheible on the way to the trap house.

[17] Nevertheless, Baldwin has not demonstrated that Detective Howard's testimony about Browers shooting a semi-automatic handgun at a car parked on Creston Drive would make more or less probable any fact of consequence to the determination of who shot Houghton or Scheible near Belmont Avenue, which was a five-minute drive away, when all the evidence indicted Houghton and Scheible were shot with a revolver, not a semi-automatic weapon. Nor would proof that Browers was involved in "orchestrating" the shooting of Houghton and Scheible relieve Baldwin of guilt for committing the actual shootings. Thus, we hold the trial court did not abuse its discretion when it excluded as irrelevant Detective Howard's testimony about Browers shooting a semi-automatic handgun at a car parked on Creston Drive. *See Tibbs*, 59 N.E.3d at 1013 ("The evidence Tibbs sought to introduce . . . was neither exculpatory nor relevant. None of the excluded evidence made it less probable that Tibbs murdered Rison or that McCarty was responsible for her murder as required under Rule of Evidence 401.").

[18] Moreover, there is no evidence of anyone but Baldwin shooting a gun in the alley behind Belmont Avenue at the relevant time. Scheible testified he was in the car when Baldwin shot Houghton in the head, and Warner testified he had never seen Scheible with a gun. Scheible testified Baldwin shot him repeatedly outside Baldwin's car, and Warner testified he saw Baldwin shoot Scheible five times in the alley. Davis testified shots were fired and then Baldwin jumped

into his car and told Davis to "go, go, go." (Tr. Vol. 2 at 120.) Myers testified Baldwin repeatedly asked Myers to clean the two revolvers. Exclusion of evidence is harmless "if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights." *Montgomery v. State*, 21 N.E.3d 846, 857 (Ind. Ct. App. 2014), *trans. denied*. The evidence implicating Baldwin in the shootings of Houghton and Scheible was such that, even if the exclusion of Detective Howard's testimony had been in error, it would have been harmless error for which we could not reverse his conviction. *See* Ind. Appellate Rule 66(A) (harmless errors are not grounds for reversal).

## Juror Misconduct

[19] Baldwin also asserts the court abused its discretion when it denied his motion for mistrial.

> Because the trial court evaluates first-hand the relevant facts and circumstances at issue and their impact on the jury, it is in the best position to evaluate whether a mistrial is warranted. We accordingly review the trial court's denial of a motion for mistrial for an abuse of discretion.

*Weisheit v. State*, 26 N.E.3d 3, 15 (Ind. 2015) (internal citations omitted), *reh'g denied*, *cert. denied* 136 S. Ct. 901 (2016). The court abuses its discretion when its decision is "clearly against the logic and effect of the facts and circumstances before the court." *Vaughn v. State*, 971 N.E.2d 63, 68 (Ind. 2012).

[20] Baldwin's motion was based on the foreperson of his jury, K.W., texting with attorney-friends on the evening between the second and third days of Baldwin's trial about the burden of proof in a criminal case. In 2014, our Indiana Supreme Court clarified how Indiana courts should determine whether a mistrial is required in circumstances such as these:

> Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, courts should skip [the] two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice.

*Ramirez v. State*, 7 N.E.3d 933, 939 (Ind. 2014).

[21] The State concedes K.W.'s contact with attorney-friends about the burden of proof in the case for which she was a juror satisfies the two-part test from *Ramirez* and creates a presumption of prejudice that the State then had the

burden to rebut.[9] Baldwin asserts, first, that K.W.'s behavior was so egregious that the prejudice to him should be irrebuttable and, second, that if the prejudice is rebuttable, the trial court erred in finding the State rebutted the prejudice to him.

[22] Baldwin argues K.W.'s behavior is akin to the facts in the three cases in which our Indiana Supreme Court has held the facts are so "egregious" that the prejudice to the defendant was irrebuttable – *May v. State*, 716 N.E.2d 419 (Ind. 1999); *Kelley v. State*, 555 N.E.2d 140 (Ind. 1990); and *Woods v. State*, 233 Ind. 320, 119 N.E.2d 558 (Ind. 1954), disapproved on other grounds by *Ketcham v. State*, 240 Ind. 107, 110-14, 162 N.E.2d 247, 248-50 (Ind. 1959). Our Indiana Supreme Court reversed May's convictions for a new trial because irrebuttable prejudice arose when, at a restaurant during a lunch break in the middle of a witness's cross-examination, that witness had a conversation with one of the jurors and the juror invited the witness to come to his house the next weekend for a social gathering. *May*, 716 N.E.2d at 422-23. In *Kelley*, irrebuttable prejudice arose when three of six jurors sat at lunch with the State's witness because: "[d]espite the lack of clear evidence that the [witness] and the jurors discussed the trial proceedings and despite the three jurors' assertions that their impartiality was intact, the enhancement of the credibility of the prosecution's

---

[9] In light of the broad reading our Indiana Supreme Court has given to that two-part test outlined in *Ramirez*, *see Weisheit*, 26 N.E.3d at 13-16 (two-part test met where juror's wife attached the following note to cookies she baked for the jury: "Thank you for your service for the family of [the child victims of the alleged crime]. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!"), we appreciate the State's explicit concession of this point at oral argument.

witness seems highly probable." *Kelley*, 555 N.E.2d at 142. Woods' convictions were reversed for "prima facie prejudice" after the State's witnesses visited with the jury during intermissions and recesses, even though no evidence suggested the witnesses and jurors discussed the case. *Woods*, 233 Ind. at 322-24, 119 N.E.2d at 560-61.

[23] We disagree with Baldwin's assertion that the facts herein are like those in *Woods*, *Kelley*, and *May*. K.W. did not interact with any witness such that her ability to be impartial when assessing witness credibility or weighing the evidence could be questioned. While her behavior was clearly inappropriate, it was not so egregious that it created an irrebuttable presumption of prejudice. *See, e.g.*, *Bisard v. State*, 26 N.E.3d 1060, 1069 (Ind. Ct. App. 2015) (holding juror's internet search on the reliability of blood test results, the results of which were shared with other jurors, did not fall into the category of cases where egregious behavior creates an irrebuttable presumption of prejudice), *trans. denied*.

[24] Next, Baldwin argues the trial court abused its discretion when it concluded the State adequately rebutted the presumption of prejudice created by K.W.'s behavior. To rebut that presumption, the State had to show "any contact or communications were harmless." *Ramirez*, 7 N.E.3d at 939. At the hearing on Baldwin's motion for mistrial, K.W. testified she did not share her text conversations with the rest of the jury, she did not receive information from those conversations that conflicted with the trial court's instructions, and she believed the jury rendered an impartial verdict based only on the trial court's

instruction defining reasonable doubt. "The trial court is in the best position to gauge the surrounding circumstances of an event and its impact on the jury, we will not second-guess the trial court in this regard." *Bisard*, 26 N.E.3d at 1069. The record supports the trial court's determination that Baldwin was not prejudiced by K.W.'s conversations with friends about the burden of proof, and we thus find no abuse of discretion therein. *See id*. (affirming trial court's decision that removal of juror who committed misconduct was sufficient to alleviate any possible prejudice).

# Conclusion

[25] The trial court did not abuse its discretion by excluding evidence that Browers shot his semi-automatic handgun at a car parked on Creston Drive on the same night that Scheible and Houghton were shot, as that evidence was neither relevant nor exculpatory and Baldwin cannot demonstrate he was harmed by its exclusion. Nor did the court abuse its discretion when it determined the State adequately rebutted the presumption that Baldwin was prejudiced by his jury foreperson's contacting friends about the burden of proof in a criminal case. We accordingly affirm.

[26] Affirmed.

Baker, J., and Altice, J., concur.