In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 23-2906

JEFFREY ALAN WEISHEIT,

*Petitioner-Appellant*,

*v.*

RON NEAL,

*Respondent-Appellee*.

———————

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:19-cv-00036-SEB-KMB — **Sarah Evans Barker**, *Judge*.

———————

ARGUED SEPTEMBER 25, 2024 — DECIDED AUGUST 13, 2025

———————

Before EASTERBROOK, ST. EVE, and PRYOR, *Circuit Judges*.

ST. EVE, *Circuit Judge*. An Indiana jury convicted Jeffrey
Weisheit of murdering a five-year-old boy and eight-year-old
girl left in his care. As recommended by the jury, his sentenc-
ing judge imposed the death penalty.

On direct appeal, the Indiana Supreme Court affirmed. Af-
ter unsuccessfully pursuing postconviction relief in Indiana
state court, Weisheit filed a habeas petition in federal court.

He also sought stays of the federal proceeding—one to return to state court to present certain claims and another to restore competency—and moved for additional funding in support of his defense.

The district court denied his petition and related motions. It found most of his claims procedurally defaulted and the remaining claims without merit.

We agree that Weisheit has procedurally defaulted most of his claims, and we conclude that the district court did not abuse its discretion in denying Weisheit's motions for stays and additional funding. As for decisions reached by the Indiana Supreme Court on the merits, the court neither unreasonably applied clearly established federal law nor made unreasonable determinations of facts. We thus affirm the district court's denial of Weisheit's petition and related motions.

## I. Background

The details of Weisheit's brutal crime do not bear on the issues before us. We therefore recount them briefly, before chronicling the procedural history of this case.

### A. Factual History

Jeffrey Weisheit and Lisa Lynch lived together with Lynch's two children—Alyssa and Caleb—in Evansville, Indiana. In early 2010, Lynch discovered she was pregnant with Weisheit's daughter. Suspicious that Lynch was having an affair, Weisheit told a coworker that if his suspicions proved true, "he would kill her, burn everything, and kill his self."

In late March, Weisheit stopped payment on an engagement ring he had purchased for Lynch, telling the jeweler that he and Lynch broke up and he was leaving the country.

Around the same time, Weisheit quit his job and withdrew all the money in his bank account.

Approximately two weeks passed. On April 9, 2010, while caring for Lynch's children, Weisheit became enraged at Caleb. Weisheit duct taped Caleb's hands behind his back and pushed a rag into his mouth. He then packed up clothes and some of Lynch's jewelry and drove off toward Cincinnati.

Officers responded to flames engulfing the couple's home early the next morning. After extinguishing the fire, firefighters discovered the bodies of Caleb and Alyssa inside. Caleb had road flares under and around his body.

In the meantime, no one could reach Weisheit. Officers eventually tracked his location to a county in Kentucky more than 200 miles away. A high speed chase ensued before local law enforcement forced Weisheit from his vehicle. When Weisheit exited, he threw a knife over an officer's head and shouted for the officers to kill him. Two officers used tasers to stun Weisheit, who fell backward and hit his head.

From there, officers took Weisheit to a local hospital where doctors administered a sedative to treat his nausea and vomiting. Detectives Kerri Lynne Blessinger and Randy Chapman read Weisheit his *Miranda* warnings, which he stated he understood, and questioned him about the events from the night before. Weisheit answered most questions with three words or less, providing no detail about the fire or deaths of the children. When asked how he set the fire or what happened to the children, Weisheit generally responded that he did not know or remember. The interview lasted approximately 20 minutes and ended when Weisheit asked for a lawyer.

**B. Procedural History**

The State of Indiana charged Weisheit with two counts of murder and one count of felony arson resulting in serious bodily injury. *See Weisheit v. State*, 26 N.E.3d 3, 7 (Ind. 2015) ("*Weisheit I*"). The State sought the death penalty, asserting the multiple murders and the age of the victims as aggravating circumstances. *Id*.

**1. The Trial**

Weisheit proceeded to trial in June 2013. On the first day, juror 10 brought a box of cookies and a thank you note from his wife into the jury room. The note read:

> Thank you for your service for the family of Alyssa [and] Caleb Lynch. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!

The trial court became aware of the cookies and note two days later and interviewed each juror to ascertain the effects of the note. Most of the jurors had not read it; the ones who had read it or otherwise learned of it generally recalled that it thanked them for serving on the jury. Juror 8 remembered the note included "words to the effect of … thank you and please do a fair job for Caleb and Alyssa." He was "surprised" to see Caleb and Alyssa mentioned, but described the note as "very neutral" and told the court that it did not affect him "at all." After the court questioned juror 10, who did not himself read the note, he was overheard saying "that's ridiculous." Other jurors responded to juror 10's exclamation with "general chatter" and "nodd[ing] their heads."

The court ultimately dismissed juror 10 for bringing in the note but denied Weisheit's motion for a mistrial, reasoning

that the note did not affect the other jurors. It admonished the jury to reach its verdict based only on the evidence presented and not to draw any negative inferences from the dismissal of juror 10.

Trial resumed. The State presented multiple witnesses who testified about the source of the fire: David Bretz, Assistant Chief of the German Township Fire Department; Clayton Kinder, Indiana State Fire Marshal; and Kerri Blessinger, a detective from the Vanderburgh County Sheriff's Office. Assistant Chief Bretz and Fire Marshal Kinder testified that the house fire was intentionally set. Detective Blessinger went a step further, identifying Weisheit as the person who set it. Trial counsel did not object to any of this testimony.

After the State rested, Weisheit testified against the advice of counsel. He discussed, among other things, arguing with and duct taping Caleb, bringing flares into the house, gathering his belonging and Lynch's jewelry, driving to Cincinnati, attempting to flee from the police, and urging the police to shoot him.

On cross-examination, he denied setting the fire. When the State pressed him with undisputed facts—e.g., that the night Weisheit left with his belongings, he bound Caleb with duct tape and firefighters found Caleb with flares under his body—Weisheit responded, "[t]hings happen."

The jury returned a guilty verdict on all charged offenses.

During the penalty phase of the trial, the State incorporated all evidence it presented in the guilt phase. Weisheit presented 17 witnesses in his defense, including family, friends, and neighbors; a former teacher; a counselor from the Indiana Boys School, where he spent six months in juvenile detention;

his former therapist; a corrections officer; and two psychological experts. Both experts testified that he suffered from bipolar disorder. The State presented two expert witnesses in rebuttal.

Weisheit also intended to call James Aiken, a retired Indiana Department of Correction Commissioner, to provide expert testimony regarding the likelihood that Weisheit could be adequately managed and secured if he received a sentence of life in prison rather than the death penalty. The court excluded Aiken's testimony as not grounded in scientific knowledge under Indiana Rule of Evidence 702.

The jury ultimately recommended a sentence of death, determining that the State proved aggravating circumstances beyond a reasonable doubt, and that those circumstances outweighed any mitigating factors. The trial court agreed and imposed the death penalty.

## 2. Direct Appeal and State Postconviction Proceedings

Weisheit appealed, raising numerous challenges: (1) the trial court erred by (a) excluding Aiken's testimony, (b) not dismissing several jurors for cause, and (c) admitting Weisheit's statement to police while he was in the hospital; (2) insufficient evidence supported his convictions; (3) the cookie note sent to the jury room violated his Sixth Amendment right to an unbiased jury; (4) the jury did not meaningfully consider mitigating circumstances; and (5) the death sentence was an inappropriate penalty. The Indiana Supreme Court unanimously affirmed Weisheit's convictions. *Weisheit I*, 26 N.E.3d at 21. The United States Supreme Court denied Weisheit's petition for a writ of certiorari. *Weisheit v. Indiana*, 577 U.S. 1106 (2016).

Weisheit then pursued postconviction relief in state court, counseled by the Public Defender of Indiana. He argued that his trial and direct appellate counsel provided ineffective assistance. Following an evidentiary hearing, the trial court denied his petition. The Indiana Supreme Court affirmed in a fractured opinion: one justice concurred in part and in the judgment, concluding that trial counsel performed deficiently at the penalty phase but finding no prejudice, *Weisheit v. State*, 109 N.E.3d 978, 994 (Ind. 2018) ("*Weisheit II*") (Slaughter, J., concurring in part and in judgment); and the Chief Justice concurred in part and dissented in part, concluding that counsel's performance was both deficient and caused Weisheit prejudice, *id.* at 996 (Rush, C.J., concurring in part and dissenting in part).

### 3. Federal Postconviction Proceedings

Unable to secure relief in state court, Weisheit filed a petition for a writ of habeas corpus in federal court under 28 U.S.C. § 2254. He advanced more than 30 claims for relief. The court denied 12 on the merits and determined that Weisheit had procedurally defaulted the rest. Still, acknowledging that reasonable jurists could disagree on the outcome of some of the claims, the court granted Weisheit a certificate of appealability. After two expansions, Weisheit secured a certificate on claims related to ineffective assistance of trial and appellate counsel; the cookie note sent to the jury; his statement to police while in the hospital; the exclusion of Aiken's testimony; and the question of procedural default.[1]

_____

[1] The State urges us not to consider whether Weisheit procedurally defaulted his claims because the certificate of appealability did not

Weisheit also filed three related motions: two to stay the federal court proceedings (to exhaust certain claims in state court and to restore his competency), and one for transport and funding pursuant to 18 U.S.C. § 3599(f). The court denied each motion.

Weisheit appeals.

## II. Discussion

All told, this appeal raises 11 issues for our consideration. We proceed in two steps. First, we review the district court's resolution of Weisheit's motions for stays and for additional funding. Second, we look at the decisions of the Indiana Supreme Court on the merits, evaluating whether the court unreasonably applied clearly established federal law or made unreasonable determinations of fact entitling Weisheit to habeas relief.

---

identify whether those claims presented "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* § 2253(c)(3). Even assuming the certificate was defective with respect to the question of procedural default, we exercise our discretion to consider it. *Gonzalez v. Thaler*, 565 U.S. 134, 137, 143 (2012) (holding that § 2253(c)(2) and (c)(3) are not jurisdictional); *Schmidt v. Foster*, 911 F.3d 469, 486 (7th Cir. 2018) (en banc) ("A defect in a certificate concerning one claim does not deprive us of jurisdiction over that claim." (citation modified)). The certificate properly issued on at least some claims and the parties have comprehensively briefed procedural default. Given the procedural complexities of this case, the high stakes of punishment, and consideration for judicial resources, we will decide whether Weisheit has procedurally defaulted these claims. *See Davis v. Borgen*, 349 F.3d 1027, 1028 (7th Cir. 2003) ("[T]he rules governing certificates of appealability are principally designed to save time for the litigants and judges, which implies that once briefs have been filed there is little point in revisiting the question whether a certificate should have been issued.").

## A. The District Court's Decisions

We begin with the district court's denial of Weisheit's motions for stays and additional funding. The court rested its decisions in part on the doctrines of procedural default and exhaustion. We evaluate these questions of law de novo, *Booker v. Baker*, 74 F.4th 889, 892 (7th Cir. 2023), but otherwise review the court's resolution of Weisheit's motions for an abuse of discretion, *Ryan v. Gonzales*, 568 U.S. 57, 74 (2013) (stays); *Ayestas v. Davis*, 584 U.S. 28, 46 (2018) (§ 3599(f) funding decisions).

### 1. *Rhines* Stay

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") restricts federal courts' review of state prisoner habeas petitions. 28 U.S.C. § 2254. One such restriction generally precludes federal courts from issuing a writ unless the petitioner has exhausted available state court remedies. § 2254(b)(1)(A). A petitioner exhausts state court remedies when he "fairly present[s] his claim in each appropriate state court." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation modified); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

All agree that Weisheit has not properly presented many of his claims in state court. When a petitioner does not properly present his claims, the Supreme Court has recognized that in certain limited circumstances a federal court "is not required to automatically deny" them. *Shinn v. Ramirez*, 596 U.S. 366, 379 (2022).

First, if state court remedies remain available, the petitioner may have the opportunity to return to state court to present his claims. *Id.*; *see also Rhines v. Weber*, 544 U.S. 269, 277–78 (2005) (permitting federal courts to stay habeas

proceedings to allow petitioners to present their claims to
state courts in the first instance, provided the petitioner meets
certain requirements). We consider these claims "unex-
hausted." *Shinn*, 596 U.S. at 379.

Second, if a petitioner has not properly presented his
claims and no state court remedies remain available, those
claims are procedurally defaulted. *Id.*; *see also Boerckel*, 526
U.S. at 847–48. In such a circumstance, we may forgive the pe-
titioner's default in federal court only upon a showing of
cause and prejudice or a miscarriage of justice. *Shinn*, 596 U.S.
at 379; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[2]

Weisheit initially planned to pursue the second course of
action. He would establish "cause" for his failure to present
his ineffective assistance of trial counsel claims with a show-
ing of ineffective assistance of state postconviction counsel.
*See Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (recognizing a "nar-
row exception" to the general rule that "an attorney's igno-
rance or inadvertence in a postconviction proceeding does not
qualify as cause to excuse a procedural default" when the un-
derlying claim alleges ineffective assistance of trial counsel);
*see also Trevino v. Thaler*, 569 U.S. 413, 417 (2013). To make this
showing, Weisheit conceded that he would need to expand
the record in federal court.

---

[2] The district court characterized as procedurally defaulted some
claims that Weisheit did properly present in state court. But its character-
ization does not change our conclusion. Res judicata bars Weisheit from
reasserting these claims in state court, *Matheney v. State*, 834 N.E.2d 658,
662 (Ind. 2005), and he has not argued that the state court unreasonably
applied clearly established federal law or made unreasonable determina-
tions of fact entitling him to habeas relief.

After he filed his habeas petition, however, the Supreme Court clarified that a petitioner cannot expand the record in federal court—even to make out a claim of ineffective assistance of counsel—unless he meets the narrow exceptions set forth in § 2254(e)(2).[3] *Shinn*, 596 U.S. at 382. Weisheit conceded that he could not satisfy these stringent requirements.

He thus changed course.

With no way to develop his unpresented claims in federal court, Weisheit sought a *Rhines* stay to present his claims to the Indiana state court in the first instance. *Rhines* empowers federal courts to issue a stay if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and he did not engage in intentionally dilatory litigation tactics. 544 U.S. at 277–78.

But *Rhines* applies only to unexhausted claims. *Id.*; *see also Day v. McDonough*, 547 U.S. 198, 210 n.10 (2006) (explaining that *Rhines* permits "a habeas petitioner to present his unexhausted claims to the state court in the first instance"). As we have said, an unexhausted claim is one that has not been—but could be—pursued in state court. *Compare Doerr v. Shinn*, 127 F.4th 1162, 1175 (9th Cir. 2025) (affirming the grant of a *Rhines* stay where Arizona procedural rules did not clearly bar successive postconviction petitions in comparable circumstances), *with Haynes v. Quarterman*, 526 F.3d 189, 197 (5th Cir.

---

[3] Section 2254(e)(2) precludes a petitioner from developing the factual basis for a claim in federal court unless the claim relies on (1) a new rule of constitutional law, or (2) a factual predicate undiscoverable by due diligence. 28 U.S.C. § 2254(e)(2)(A); *see also Shinn*, 596 U.S. at 382. In either case, the new evidence must establish the petitioner's innocence "by clear and convincing evidence." § 2254(e)(2)(B); *Shinn*, 596 U.S. at 381.

2008) (affirming the denial of a *Rhines* stay where the petitioner offered "no meritorious argument that the Texas [state court] would allow him to file a successive application for post-conviction relief"), *and Sanders v. Jordan*, No. 16-6152, 2023 WL 11978492, at *2, *4 (6th Cir. Feb. 8, 2023) (denying a *Rhines* stay where the petitioner had "no unexhausted claims" because a Kentucky law barring presentation of "issues that could reasonably have been presented" in an earlier postconviction proceeding precluded his claims). Weisheit must therefore establish an "available" state court procedure through which to pursue his claims. *Boerckel*, 526 U.S. at 848.

Generously reading Weisheit's appellate briefing, he offers two avenues for relief in Indiana: a successive postconviction petition under Indiana Rules of Post-Conviction Remedies 1(12) or a petition based on "new evidence" under Indiana Code § 35-50-2-9(k). He identifies no "new evidence" under subsection k, however, foreclosing that avenue of relief.

As for Weisheit's successive petition advocacy, Postconviction Rule 1(12) requires defendants in capital cases to seek permission from the Indiana Supreme Court before they may file a successive petition. *Isom v. State*, 235 N.E.3d 150, 151 (Ind. 2024). In Indiana, only certain issues are available to a successive petitioner. *See Matheney*, 834 N.E.2d at 662; *see also Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001) ("Postconviction procedures do not afford a petitioner with a super-appeal."). A petitioner may not present "[c]laims that could have been, but were not, raised in earlier proceedings," *Matheney*, 834 N.E.2d at 662, absent a "sufficient reason," Ind. P-C.R. 1(8). Nor may a petitioner present an issue raised but adversely decided. *Matheney*, 834 N.E.2d at 662. Assuming a petitioner's claim is not barred in

one of these ways, the Indiana court will still only grant permission to file a successive petition if the petitioner shows "a 'reasonable possibility' that he is entitled to relief." *Isom*, 235 N.E.3d at 151 (quoting Ind. P-C.R. 1(12)(b)).

The claims that Weisheit seeks to "exhaust" in state court fall into two categories: those that allege ineffective assistance of trial counsel and those that do not.

Weisheit has not argued that his non-ineffective assistance of trial counsel claims—claims premised on failures of the trial court and his competency, among others—were unknown to him in earlier proceedings. Nor does he attempt to justify his failure to raise these claims with any coherent argument. Weisheit therefore cannot bring these claims through a successive petition. *See, e.g.*, *Timberlake*, 753 N.E.2d at 598 ("[T]he issue of … competency at trial was known and available on direct appeal and is therefore not available as a free-standing claim in post-conviction relief."); *Matheney*, 834 N.E.2d at 664 (holding that the petitioner's claim alleging trial court errors was procedurally defaulted where he made "no showing that the particular errors … were unknown in earlier review proceedings").

The same is true with respect to Weisheit's ineffective assistance of counsel claims. He attempts to excuse his failure to properly assert these claims by alleging ineffective assistance of his state postconviction counsel. But Indiana law judges the performance of postconviction counsel against an exceedingly low benchmark. Counsel need only "in fact appear[] and represent[] the petitioner in a procedurally fair setting which resulted in a judgment of the court." *Graves v. State*, 823 N.E.2d 1193, 1196 (Ind. 2005) (quoting *Baum v. State*, 533 N.E.2d 1200, 1201 (Ind. 1989)).

Weisheit does not argue that his postconviction counsel fell below this standard. Instead, he urges us to deem his claims unexhausted in light of a trio of relevant Supreme Court decisions: *Martinez*, *Trevino*, and *Shinn*. In *Martinez* and *Trevino*, the Court permitted habeas petitioners to rely on ineffective postconviction counsel to show cause for defaulted ineffective assistance of trial counsel claims. *Martinez*, 566 U.S. at 9; *Trevino*, 569 U.S. at 417. In *Shinn*, the Court clarified that even where petitioners invoke *Martinez* and *Trevino*, they cannot expand the record in federal court without meeting the § 2254(e) requirements. *Shinn*, 596 U.S. at 382.

Weisheit's argument comes too late. After the district court issued its opinion denying relief, but before Weisheit filed his reply brief on appeal, the Indiana Supreme Court expressly considered its state court procedures in light of federal habeas jurisprudence: "While the rule from *Martinez* and *Trevino* preserves certain otherwise waived claims for federal habeas review when state post-conviction counsel were ineffective, it does not preserve claims in state proceedings." *Isom*, 235 N.3d at 155.

The Indiana Supreme Court recently reaffirmed its low standard for postconviction counsel. *See Ritchie v. State*, 254 N.E.3d 1064, 1065 (Ind. 2025) (declining the petitioner's invitation, given "developments in the law," to reconsider Indiana's standard for postconviction counsel), *cert. denied*, No. 24-7157, 2025 WL 1431934 (U.S. May 19, 2025). Although the *Ritchie* majority denied the petitioner's request to file a successive petition without reasoning, the concurrence observed the petitioner could not overcome his unpresented ineffective assistance claim "under [Indiana's] prevailing standard" for assessing state postconviction counsel. *Id.* at 1066–67 (Slaughter,

J., concurring). "All seem to agree," Justice Slaughter recognized, the petitioner "loses … because his post-conviction counsel appeared and represented him during his first post-conviction proceeding." *Id.* at 1067.

So too here. Respecting comity in our dual system of government, "it would be unseemly … for a federal district court to upset a state court conviction without giving an opportunity to the state courts to correct a constitutional violation, and to do so consistent with their own procedures." *Shinn*, 596 U.S. at 379 (citation modified). Weisheit has established no avenue for Indiana to correct his alleged violations consistent with its own procedures.[4] *Cf. Boerckel*, 526 U.S. at 847–48 (explaining that the exhaustion doctrine does not "require[] federal courts to ignore a state law or rule providing that a given procedure is not available"). We thus affirm the district court's denial of a *Rhines* stay because Weisheit has no unexhausted claims to present in state court.[5]

---

[4] Weisheit also advances an argument that, to the extent Indiana would not hear his unpresented claims, the state's postconviction system provides an unfair forum for petitioners to raise collateral claims. None of the law Weisheit cites compels this conclusion. *See, e.g.*, *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (clarifying that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule"); *Marino v. Ragen*, 332 U.S. 561, 567 (1947) (Rutledge, J., concurring) (describing the Illinois collateral review process).

[5] As of oral argument, Weisheit had not sought leave to file a successive petition in the Indiana Supreme Court. Given the admonishment in *Rhines* that a district court should not grant a stay where a petitioner "engages in abusive litigation tactics or intentional delay," we doubt the

### 2. Competency Stay

Weisheit also challenges the district court's decision to deny his request for a stay on the basis that he was not competent to assist counsel in his habeas proceedings.

Federal habeas petitioners have no constitutional right to competence, and the Supreme Court has yet to recognize a right grounded in statute. *Gonzales*, 568 U.S. at 61 (holding that neither 18 U.S.C. § 3599 nor § 4241 provides such a right). But district courts may exercise their discretion to grant competency-based stays. *Id.* at 73–74. The outer limits of that discretion counsel against a stay when the petitioner's claims were adjudicated by the state courts on the merits, involve pure questions of law, or are procedurally defaulted (and cannot be excused). *Id.* at 74–76; *see also Holmes v. Neal*, 816 F.3d 949, 951 (7th Cir. 2016); *Lay v. Royal*, 860 F.3d 1307, 1314 (10th Cir. 2017).

In these instances, the petitioner's assistance would not "substantially benefit" the development of his claim. *Gonzales*, 568 U.S. at 76. If the state court decided the merits, we must confine our review to the state court record. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). If the claim sounded in a question of law or was procedurally defaulted without excuse, its success would not depend on the petitioner's competence because "any evidence that [the] petitioner might have would

---

propriety of a stay even if Weisheit's claims were simply unexhausted. *See Rhines*, 544 U.S. at 277–78 (expressing "particular" concern that "capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death").

be inadmissible" or irrelevant to the resolution of his claims. *Gonzales*, 568 U.S. at 75–76.

The district court denied Weisheit's motion for a competency-based stay because his claims were all either resolved on the merits by the state court or not properly exhausted and barred. We agree. Because Weisheit's assistance would provide no "substantial[] benefit" for the reasons discussed in this opinion, the district court did not abuse its discretion in denying Weisheit's motion for a competency-based stay.

### 3. Section 3599(f) Funding

Weisheit also challenges the district court's denial of his request for funding and transport to obtain new brain imaging under 18 U.S.C. § 3599(f). He hoped to use the imaging, which would allegedly show brain abnormalities that correlate with impaired functioning, to establish trial counsel's ineffectiveness in failing to present expert mitigating evidence.

Section 3599(a) authorizes federal funding for a petitioner "who is facing the prospect of a death sentence and is 'financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services.'" *Ayestas*, 584 U.S. at 43 (quoting § 3599(a)). Subsection (f) specifically permits a district court to authorize funding for "investigative, expert, or other services" upon a determination that such services "are reasonably necessary for the representation of the defendant." § 3599(f); *see also Ayestas*, 584 U.S. at 43. "Proper application of the 'reasonably necessary' standard … requires courts to consider the potential merit of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the

prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Ayestas*, 584 U.S. at 46–47. If this standard is met, the district court has "broad discretion" to decide whether to authorize funding. *Id.* at 43–46.

Funding is not reasonably necessary if a petitioner has no forum to introduce the uncovered evidence. *See Shoop v. Twyford*, 596 U.S. 811, 817–21 (2022) (finding an order for transportation for medical testing not "necessary or appropriate" under the All Writs Act because § 2254(e)(2) barred the petitioner from introducing any uncovered evidence in his federal habeas proceeding); *Nelson v. Lumpkin*, 72 F.4th 649, 657 n.2 (5th Cir. 2023) (holding that investigative services were not reasonably necessary under § 3599(f) because the petitioner could not meet the § 2254(e)(2) requirements), *cert. denied*, 144 S. Ct. 1344 (2024). "[C]onsistent with AEDPA," federal courts must "determine at the outset whether … new evidence sought could be lawfully considered." *Twyford*, 596 U.S. at 820.

Weisheit himself recognizes that he cannot present any evidence discovered from additional funding in federal court. And he has not persuaded us that Indiana would allow him to expand the record in state court.[6] Whatever the results of the testing Weisheit seeks, then, testing is not reasonably necessary because he has no forum in which to present the

---

[6] In any event, as the district court observed, Weisheit has identified no authority that requires federal courts to fund subsequent state court litigation. *Cf. Harbison v. Bell*, 556 U.S. 180, 189–90 & n.7 (2009) (clarifying that § 3599(e) permits, but does not require, federal courts to provide representation in subsequent state postconviction proceedings).

results. The district court thus did not abuse its discretion in denying funding to develop new evidence.[7]

## B. The State Court's Decisions

We turn now to the claims Weisheit properly presented to the Indiana state courts.

When a state court has adjudicated the merits of a habeas petitioner's claim, we may grant relief in two limited circumstances: where the state court (1) contradicted or unreasonably applied clearly established federal law, as determined by the United States Supreme Court; or (2) based its decision on an unreasonable determination of facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)–(2); *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). We look here to the decisions of the Indiana Supreme Court, as "the last state court to decide" Weisheit's federal claims. *Sellers*, 584 U.S. at 125.

Evaluating a claim for habeas relief under § 2254(d) requires us to focus on "the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims," and then to afford "appropriate deference" to that decision. *Sellers*, 584 U.S. at 125. If the state court "explains its decision on the merits in a reasoned opinion," that deference is substantial—we defer so long as "the specific reasons given by the state court … are reasonable." *Id.*

---

[7] That the district court authorized some funding for brain imaging prior to the Court's decision in *Shinn* does not alter the analysis. *Shinn* definitively closed the door on factual development in federal habeas proceedings absent narrow exceptions.

Weisheit's habeas petition implicates both avenues of re-
lief under § 2254(d). For challenges asserting that the state
court unreasonably applied clearly established federal law,
only law as determined by Supreme Court holdings can jus-
tify relief. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S.
362, 412 (2000). If federal law clearly or inevitably applies to a
set of facts, courts must apply it. *Schmidt*, 911 F.3d at 477; *see
also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (emphasiz-
ing that "AEDPA does not require state and federal courts to
wait for some nearly identical factual pattern before a legal
rule must be applied" (citation modified)). But the Supreme
Court has "cautioned against stretching its precedent to de-
clare state-court decisions unreasonable." *Schmidt*, 911 F.3d at
477; *see also, e.g.*, *White v. Woodall*, 572 U.S. 415, 426 (2014); *Ne-
vada v. Jackson*, 569 U.S. 505, 512 (2013).

Whether the application of clearly established law is "un-
reasonable," then, depends upon the nature of the rule itself—
"[t]he more general the rule, the more leeway courts have in
reaching outcomes in case-by-case determinations." *Yar-
borough v. Alvarado*, 541 U.S. 652, 664 (2004). Ultimately, for a
writ to issue based on an unreasonable application of federal
law, the state court's ruling must be "so lacking in justification
that there was an error well understood and comprehended
in existing law beyond any possibility for fairminded disa-
greement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

A petitioner faces an equally high hurdle when challeng-
ing a state court's factual determinations under § 2254(d)(2).
Although the Court has not defined precisely when a factual
determination qualifies as "unreasonable," it has made clear
when a determination is *not* unreasonable: a state court's fac-
tual determination is not unreasonable "merely because the

federal habeas court would have reached a different conclusion," nor if "reasonable minds" could disagree. *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation modified); *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). Unless a petitioner presents "clear and convincing evidence" to the contrary, we presume that a state court's factual findings are correct. § 2254(e)(1); *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020); *Ward v. Sternes*, 334 F.3d 696, 703–04 (7th Cir. 2003).[8]

AEDPA presents an "intentionally difficult" standard for habeas petitioners to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation modified). It aims "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to advance the principles of comity, finality, and federalism." *Twyford*, 596 U.S. at 818 (citation modified). So when federal courts evaluate challenges to state court determinations, whether grounded in law or fact, we do not decide if "the state court's determination was incorrect, but whether that determination was unreasonable—'a substantially higher threshold.'" *Id.* at 819 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

With these well-established rules in mind, we turn to Weisheit's claims.

---

[8] The Supreme Court has "left open the question" whether federal courts should review all § 2254(d)(2) challenges under the "clear and convincing evidence" standard set forth in § 2254(e)(1). *Wood*, 558 U.S. at 300; *see also Brumfield*, 576 U.S. at 322 ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)" (quoting *Burt v. Titlow*, 571 U.S. 12, 18 (2013)). Absent instruction to the contrary, however, we will continue to apply this standard. *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 495 (7th Cir. 1997) (en banc). We note that our conclusion stands even relying on § 2254(d)(2) alone.

### 1. Juror Challenges

We first address Weisheit's challenges that implicate the constitutional guarantee of an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). Weisheit argues that the trial court violated this right in two ways: by denying his for-cause motions to strike venirepersons and by not declaring a mistrial after discovering the thank you note juror 10 brought with a box of cookies for the jury.

The seating of even one juror "who will automatically vote for the death penalty" violates a defendant's right to an impartial jury. *Morgan*, 504 U.S. at 729. But requiring a defendant to use peremptory strikes to achieve an impartial jury does not, on its own, violate the Constitution. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988); *see also Rivera v. Illinois*, 556 U.S. 148, 157–59 (2009); *United States v. Martinez-Salazar*, 528 U.S. 304, 313–15 (2000). This means that to prevail on his claim challenging the court's denial of his for-cause motions to strike, Weisheit must identify at least one biased juror on the jury.

Before the Indiana Supreme Court, Weisheit argued that by improperly denying his for-cause objections, the trial court forced him to deplete his allotment of peremptory strikes and ultimately accept jurors "who, [while] not necessarily positioned to be challenged for cause, were biased against his evidence in either the guilty phase, penalty phase, or both." Although he reproduced a handful of statements made by jurors who ultimately served, Weisheit did not articulate, let alone develop, specific objections. The Indiana Supreme Court's conclusion that Weisheit failed to show an objectionable or

biased juror served on his jury is consistent with *Ross* and other clearly established federal law. *See Weisheit I*, 26 N.E.3d at 13.

Weisheit's challenges regarding the cookie note fare no better. As part of the Constitution's impartial jury requirement, jurors must reach their verdict relying solely upon "evidence and argument in open court, and not [upon] any outside influence." *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *Patterson v. Colorado*, 205 U.S. 454, 462 (1907)). "In a criminal case, any private communication … with a juror during a trial about the matter pending before the jury is … deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954); *United States v. Coney*, 76 F.4th 602, 607 (7th Cir. 2023). The State can rebut this presumption with a showing, "after notice to and hearing of the defendant," that the juror contact was harmless. *Remmer*, 347 U.S. at 229.

Resolving questions of jury impartiality "involves credibility findings whose basis cannot be easily discerned from an appellate record." *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (quoting *Wainwright v. Witt*, 469 U.S. 412, 429 (1985)). We thus rely upon a trial court's "superior capacity" to evaluate the credibility of jurors and afford great deference to that court's determinations. *Id.* at 113; *see also Rice v. Collins*, 546 U.S. 333, 341–42 (2006) (declaring that habeas courts may not "supersede the trial court's credibility determination" simply because "[r]easonable minds reviewing the record might disagree").

The Indiana Supreme Court properly applied this law. It first acknowledged that the cookie note created a presumption of prejudice. It then held that the State rebutted such presumption by demonstrating that the cookie note was

harmless. The court grounded its conclusion on the trial court's swift corrective actions, including the court's investigation of the effect of the note and individual questioning of each juror (and finding that over half of the jurors did not even read it); determination that the jurors credibly stated that the note did not affect their ability to impartially serve; and admonishment to the jury that it must base its verdict only on presented evidence. *Weisheit I*, 26 N.E.3d at 16. It described the note as "merely offer[ing] encouragement and gratitude for the jury's no doubt difficult job ahead," and observed that it "made no mention of Weisheit at all." *Id.*

Weisheit has not established that these findings were unreasonable. Weisheit's disagreement with the court's credibility determinations—for example, that the note left a deeper impression on one juror in particular—does not suffice for habeas relief. *See Collins*, 546 U.S. at 341–42 (concluding that the trial court could accept the prosecutor's race-neutral justifications for excluding a juror despite having "reason to question the prosecutor's credibility").

Nor does the court's interpretation of the cookie note as "merely offer[ing] encouragement and gratitude for the jury's no doubt difficult job ahead[,]" *Weisheit I*, 26 N.E.3d at 16, rather than, as Weisheit sees it, a note aimed at "service for the family of Alyssa [and] Caleb Lynch." Differing interpretations can be reasonable. *See Collins*, 546 U.S. at 342 (habeas courts may not rely on "debatable inferences" to set aside a state court's factual determinations). However reasonable Weisheit's view, he must affirmatively establish that the court's was "unreasonable … in light of the evidence presented." 28 U.S.C. § 2254(d)(2); *Wood*, 558 U.S. at 301.

He has not met this stringent standard. Some record evidence supports the court's interpretation, including the juror recollections that the note just thanked them for their service. In any event, the court's decision to affirm denial of a mistrial did not depend on its interpretation of the note. The court instead appropriately based its affirmance on the trial court's thorough investigation of the note's lack of impact on jurors.

Which brings us to Weisheit's next perceived deficiency: the Indiana Supreme Court's reliance on the trial court's admonishment. This was proper. Clearly established federal law plainly states that trial courts may presume jurors follow their instructions. *See Samia v. United States*, 599 U.S. 635, 646 (2023); *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).[9]

So too was the court's treatment of the two-day gap between the jurors' receipt of the note and the trial court's investigation and juror 10's commentary on the investigation. *See Weisheit I*, 26 N.E.3d at 14. Given the conclusion that the cookie note was harmless, the gap in its discovery is irrelevant. The same is true with respect to juror 10's "ridiculous" comment, which the court expressly addressed, and the other jurors "nodding their heads" in response—an ambiguous action

---

[9] *Smith v. Phillips*, 455 U.S. 209 (1982), the only Supreme Court case that Weisheit cites on this point, bolsters our conclusion. There, the Court remarked that due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful … to determine the effect of [prejudicial] occurrences when they happen." *Id.* at 217. "Such determinations," the Court continued, "may properly be made at a hearing"—just like the one the trial judge held here. *Id.* Even Justice O'Connor writing in concurrence (the only part of the opinion on which Weisheit relies) acknowledges that "in most instances a postconviction hearing will be adequate to determine" juror bias. *Id.* at 222.

that Weisheit did not raise before the Indiana Supreme Court and does not amount to evidence of much of anything.

Because Weisheit has not established that the court made unreasonable determinations of fact or applications of law, he is not entitled to relief on his claims of juror bias.

### 2. Custodial Statement

We turn next to the trial court's decision to admit Weisheit's post-arrest statement to police while hospitalized. Weisheit claims his statement was involuntary, and thus challenges its admission as a violation of his constitutional rights. The Indiana Supreme Court's conclusion to the contrary, he argues, rested on an unreasonable determination of facts.

Both the Due Process Clause of the Fourteenth Amendment and the Fifth Amendment forbid the admission of an involuntary confession into evidence in a criminal case. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). Whether a statement is voluntary depends upon "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A statement that is coerced by means of, e.g., violence, threats, or prolonged interrogation tactics is not voluntary. *Berghuis v. Thompkins*, 560 U.S. 370, 387–88 (2010). At bottom, we aim to determine whether "the defendant's will was in fact overborne" by police in their interrogation. *Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017) (en banc).

The trial court held a suppression hearing to resolve this question, where it considered testimony from officers and medical professionals and a recording of Weisheit's

statement. In admitting the statement as voluntary, the trial court found that Weisheit was alert and oriented and that the officers conducting his interview did not employ overbearing or coercive conduct. The Indiana Supreme Court affirmed, highlighting the following pieces of evidence: Weisheit had only a mild brain contusion; the on-site examining physician testified that Weisheit was alert and oriented; another physician testified that Weisheit was capable of understanding and participating in his conversation with police; Weisheit ingested no drugs other than anti-nausea medication; the officers conducting the interview testified that Weisheit selectively feigned sleep based on the subject matter of their questions but was otherwise responsive; and the interview was relatively brief, lasting less than 20 minutes, and ceased when Weisheit asked for an attorney.

Weisheit disputes most of these factual determinations. But once again, he has not persuaded us that any were unreasonable.

He claims, for example, that the court erred in characterizing his injuries as minor. Yet he fails to account for the testimony from medical professionals that his concussion was indeed minor, and that he was oriented and capable of understanding his conversation with police.

His contention that the officers used "coercive" tactics by suggesting that he "needed" to speak with them is similarly belied by the record. The interview transcript contains no indicators of coercion. Moreover, Weisheit asked for a lawyer less than 20 minutes into the interview, revealing that he understood his rights. *See Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) ("The inquiry is simply whether the warnings

reasonably convey to a suspect his rights as required by *Miranda*." (citation modified)).

Weisheit next asserts that, rather than feigning sleep, a "better explanation" for his bouts of nonresponsiveness is that he had just suffered a brain injury and was medicated. This argument misapprehends our role. We assess only reasonableness. If reasonable minds could differ, regardless of the "better" explanation, we cannot supersede the state court's determination. *Brumfield*, 576 U.S. at 313–14; *Collins*, 546 U.S. at 341–42; *Pierce v. Vanihel*, 93 F.4th 1036, 1046–47 (7th Cir. 2024) (competing plausible interpretations precluded displacement of the state court's factual determinations). In all, given the testimony of the officers and medical professionals and the interview recording itself, we have no trouble deeming the state court's factual determinations reasonable.

Recall that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664. Voluntariness is a general standard that "demand[s] a substantial element of judgment." *Dassey*, 877 F.3d at 303 (citation modified). The Indiana Supreme Court's ultimate conclusion that Weisheit's statement was voluntary fell well within the bounds of reasonableness, barring habeas relief on this issue.

### 3. Exclusion of Expert Testimony

At the penalty phase of the trial, defense counsel attempted to call expert witness James Aiken, a former prison warden and consultant, to testify regarding Weisheit's future dangerousness. Aiken would have testified that a prison could adequately manage and secure Weisheit without endangering prison staff, other inmates, or the public should he

receive a life sentence. The trial court excluded his testimony on objection from the State under Indiana Rule of Evidence 702, which governs the admission of expert testimony.

The Indiana Supreme Court affirmed, reasoning that "counsel neither established Aiken's qualifications to predict future behavior, nor did he make an offer of proof as to Aiken's specific predictions of Weisheit's potential future classification in prison." *Weisheit II*, 109 N.E.3d at 987; *see also Weisheit I*, 26 N.E.3d at 10. Weisheit challenges this conclusion as an unreasonable application of a few clearly established federal rules and principles.

Generally, the Eighth Amendment requires that "the sentencer in capital cases … be permitted to consider any relevant mitigating factor." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *see also Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978). This includes "evidence that the defendant would not pose a danger if spared (but incarcerated)." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). Prosecutors, too, may rely on a defendant's future dangerousness in pursuing the death penalty. *Barefoot v. Estelle*, 463 U.S. 880, 896–97 (1983) (psychiatrists may predict future dangerousness); *see also Jurek v. Texas*, 428 U.S. 262, 275–76 (1976). When a prosecutor introduces evidence of a defendant's future dangerousness, it is not just the Eighth Amendment, but due process, that demands a defendant have the "opportunity to deny or explain." *Skipper*, 476 U.S. at 5 n.1 (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)); *see also Simmons v. South Carolina*, 512 U.S. 154, 164 (1994).

Weisheit contends that these cases clearly establish his entitlement to present Aiken's proposed testimony on future dangerousness. Even assuming capital defendants have some right to introduce this kind of testimony, however, it would

not extend so far as to prevent Indiana from setting reasonable limits on the evidence a defendant can submit and the manner in which it is submitted. *See Oregon v. Guzek*, 546 U.S. 517, 526 (2006); *see also United States v. Tsarnaev*, 595 U.S. 302, 319 (2022) ("Because the States … retain the traditional authority to decide that certain types of evidence may have insufficient probative value to justify their admission, they may enact reasonable rules governing whether specific pieces of evidence are admissible." (citation modified)); *Barefoot*, 463 U.S. at 904 ("Although cases such as this involve the death penalty, we perceive no constitutional barrier to applying the ordinary rules of evidence governing the use of expert testimony.").

The Indiana Supreme Court affirmed the trial court's decision that Aiken was unqualified under Indiana rules of evidence. *Weisheit I*, 26 N.E.3d at 9–10. After applying *Skipper* to conclude "error would ensue" if the trial court prevented Weisheit from "introducing otherwise admissible evidence" regarding Weisheit's future dangerousness, it observed that "[f]or all [Aiken's] knowledge and expertise in classifying inmates, [he] is not an expert in predicting future behavior." *Id.* at 10.

We cannot grant habeas relief based on determinations of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Absent an argument that Indiana's evidentiary rule itself violates the Constitution—an argument Weisheit does not make—we do not review the Indiana Supreme Court's application of state rules of evidence. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law … binds a federal court sitting in habeas corpus."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Given the inadmissibility of Aiken's testimony, the court did not unreasonably apply *Skipper*, *Simmons*, or any other clearly established law in excluding it. *See Skipper*, 476 U.S. at 7 (rejecting a rule that would effectively "preclud[e] the defendant from introducing *otherwise admissible evidence*" of future dangerousness (emphasis added)).[10]

### 4. *Strickland* Challenges

Weisheit's final set of challenges concern his right to the effective assistance of counsel under the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on an ineffective assistance of trial counsel claim, a petitioner must show that counsel (1) provided a deficient performance, that (2) caused him prejudice. *Thornell v. Jones*, 602 U.S. 154, 163 (2024); *Strickland*, 466 U.S. at 687.

Counsel's performance is deficient when it falls "below an objective standard of reasonableness … under prevailing professional norms." *Strickland*, 466 U.S. at 688. In the death penalty context, deficient performance causes prejudice where there exists "a reasonable probability" that but for the deficiency, at least one juror would have imposed a sentence other than death. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *Thornell*,

---

[10] In fact, *Skipper* supports a contrary conclusion. The state in *Skipper* attempted to defend the trial court's exclusion of nondangerousness testimony by arguing that the court simply prohibited "incompetent lay opinion testimony regarding petitioner's ability to adjust to prison life in the future." *Skipper*, 476 U.S. at 5. The Supreme Court rejected this argument, emphasizing that the witnesses intended to testify that the petitioner "*has made* a good adjustment to jail"—"nonopinion evidence" concerning *past behavior*. *Id*. at 5–6. "Defense counsel," the Court made clear, "was not offering opinion testimony regarding future events." *Id*. at 6. That is the precise testimony the state courts confronted here.

602 U.S. at 163 (elaborating that a "reasonable probability is a probability sufficient to undermine confidence in the outcome," which "requires a substantial, not just conceivable, likelihood of a different [sentencing] result" (citation modified)). In undertaking this analysis, courts consider the totality of the evidence, weighing all available mitigating evidence against aggravating evidence. *Strickland*, 466 U.S. at 695–96; *Williams*, 529 U.S. at 397–98.

On its own, *Strickland* presents a high hurdle for defendants to overcome. *Richter*, 562 U.S. at 105. When a *Strickland* claim arises in a § 2254 petition, the hurdle heightens. The Supreme Court has described our review in these circumstances as "doubly" deferential: we no longer consider simply whether counsel's actions were reasonable, but whether the state court's decision was reasonable. *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Because "[t]he *Strickland* standard is a general one," that range of reasonableness is "substantial." *Id.* We ask only "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (emphasis added).

With the clearly established law well settled, we turn to Weisheit's four ineffective assistance of counsel claims: counsel provided ineffective assistance by (1) failing to investigate and obtain records from Weisheit's time at the Indiana Boys School; (2) failing to present relevant expert mitigating evidence; (3) failing to object to the testimony of three witnesses who opined that the fire was intentionally set; and (4) failing to make an adequate offer of proof on the admissibility of Aiken's testimony. Weisheit contends that in affirming the trial court's decision on these claims, the Indiana Supreme Court unreasonably applied *Strickland*. We disagree.

### a. Indiana Boys School Records

We begin with defense counsel's treatment of Weisheit's records from the Indiana Boys School, a juvenile correctional institution. Weisheit spent roughly six months at the Boys School between 1992 and 1993. Records from his time there illustrate Weisheit's mental health challenges.

Weisheit's trial counsel sought to obtain these records, but the Department of Correction responded that a search revealed no match. The Department clarified that it maintained a policy to destroy records for any offender out of its facility for more than ten years. Weisheit had been out of the Boys School for far longer. Although his counsel stopped pursuing the Boys School records, they secured other mental health records from that time and provided them to Weisheit's experts.

It turns out Weisheit's Boys School records did exist. The Indiana State Archives had a copy, which Weisheit's postconviction counsel managed to obtain. Weisheit claims that his trial counsel performed ineffectively in failing to secure those records.

To be sure, the Constitution imposes a duty on counsel "to make reasonable investigations." *Strickland*, 466 U.S. at 691. The scope of this duty encompasses "the quantum of evidence already known to counsel," but also circumstances where "the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Clearly established law arms us with some certainties: counsel must learn the law that is "fundamental" to their case, *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); undertake at least some investigation into known and potentially powerful mitigating evidence, *Wiggins*, 539 U.S. at 527; and pursue "readily

available" information that the prosecution will probably rely upon, *Rompilla v. Beard*, 545 U.S. 374, 385 (2005). The Supreme Court has also instructed that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* at 383 (counsel need not "scour the globe on the off chance something will turn up"). Beyond that, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

The Indiana Supreme Court reasonably applied *Strickland*, *Wiggins*, and other applicable law when it determined that trial counsel was not deficient for failing to obtain Weisheit's Boys School records. No clearly established federal law requires counsel to inform themselves of an agency record-keeping policy that may lead to the discovery of beneficial mitigation evidence—particularly where, as here, counsel introduced much of the mitigation evidence by other means and the agency represented it did not have the records. *See Bobby v. Van Hook*, 558 U.S. 4, 11–12 (2009) ("[D]efense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments." (citation modified)). As far as Weisheit's counsel knew, the Department had destroyed Weisheit's records. The record contains no evidence that counsel learned they could access the records another way or knew they should have followed up with the archives. The communication from the Department was the only "known evidence" regarding the status of the records, and it would not have led a "reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Even if counsel did provide inadequate assistance, Weisheit has not demonstrated that the Indiana Supreme Court misapplied clearly established law in finding no prejudice. Counsel does not need to obtain "merely cumulative" evidence that would make "little difference" in the outcome of a proceeding. *Wong v. Belmontes*, 558 U.S. 15, 22 (2009) (per curiam); *see also Westray v. Brookhart*, 36 F.4th 737, 753 (7th Cir. 2022) (finding no prejudice where witnesses testified about the defendant's abuse but counsel did not introduce reports corroborating the abuse).

The Indiana Supreme Court observed that Weisheit's history of mental illness, which the Boys School records would have corroborated, came into evidence via testimony from multiple expert witnesses—including a correctional counselor at the Boys School. At his state postconviction hearing, one of Weisheit's experts even testified that although the records contained significant additional information, they did not alter or conflict with the opinion she gave about Weisheit's mental illness during trial. *See Weisheit II*, 109 N.E.3d at 985.

Notwithstanding Weisheit's contentions to the contrary, the Indiana Supreme Court also acknowledged Weisheit's argument that the Boys School records could have "forcefully countered" the State's attempt to downplay the impact of Weisheit's mental illness. *Id*. Rather than ignore the argument, the court came to the reasonable conclusion that Weisheit's counsel rebutted the State's attempt through its own presentation of the evidence. Counsel pointed to admitted records "rife with suicide attempts, depression, medication," and inadequate treatment during Weisheit's childhood. *Id.* (citation modified).

Given that Weisheit "*did* put on substantial mitigation evidence, much of it targeting the same" mental illness evidence he sought to introduce through the Boys School records, "[t]he sentencing jury was … 'well acquainted' with [Weisheit's] background." *Belmontes*, 558 U.S. at 23 (quoting *Landrigan*, 550 U.S. at 481) (reversing a finding of prejudice for counsel's failure to introduce specific evidence of the petitioner's childhood and positive attributes because counsel introduced other evidence "targeting the same … theme"). "Additional evidence" on his history of mental illness "would have offered an insignificant benefit, if any at all." *Id.*

The Indiana Supreme Court recognized an additional bar to prejudice: presenting the Boys School records at trial could have had a counterproductive effect by exposing jurors to Weisheit's behavior as a teenager, including his lack of remorse, auto theft, fighting, threats, and cruelty to animals.

Weisheit claims that this conclusion runs contrary to *Sears v. Upton*, 561 U.S. 945 (2010), which clarified that the presence of adverse evidence accompanying mitigating evidence does not automatically trigger a finding of no prejudice. *Id.* at 951. But *Sears* does not save Weisheit's claim. There, defense counsel "should have been able to turn some of the adverse evidence" regarding the defendant's "grandiose self-conception and … magical thinking" into a positive, namely, expert mitigation testimony of his "profound personality disorder." *Id.* (citation omitted). Because counsel in *Sears* conducted an inadequate mitigation investigation, "*none* of this evidence was known to Sears' trial counsel." *Id.*

This case is not like *Sears*. The jury heard substantial evidence of Weisheit's mental illness and suicidal ideation. The Indiana Supreme Court properly applied U.S. Supreme Court

precedent by considering "*all* the relevant evidence that the jury would have had before it" in undertaking its prejudice analysis. *Belmontes*, 558 U.S. at 20.

The Indiana Supreme Court did not unreasonably apply clearly established law when it found Weisheit did not prove the introduction of the Boys School records would have created a reasonable probability of a lesser sentence. *See Strickland*, 466 U.S. at 700 (finding no prejudice where the proffered evidence "would barely have altered the sentencing profile presented to the sentencing judge").

### b. Expert Mitigation Testimony

Weisheit next takes aim at his trial counsel for not presenting expert mitigation evidence from Dr. Philip Harvey and Dr. Ruben Gur during the penalty phase of his trial.

The defense retained Dr. Harvey, a qualified neuropsychologist, to testify regarding Weisheit's bipolar disorder. Based on a misunderstanding, counsel thought Dr. Harvey was unavailable to testify and engaged another qualified expert witness, Dr. David Price.

Dr. Price, a psychologist, received a memorandum prepared by Dr. Harvey that detailed his observations of Weisheit during a meeting the two had and more general impressions of Weisheit's mental health. In this memorandum, Dr. Harvey reported seeing Weisheit in a manic state. Dr. Price separately conducted his own assessments of Weisheit. He ultimately testified in mitigation at the penalty phase of trial, explaining that based on his multiple assessments and a review of medical records dating back to Weisheit's childhood, Weisheit suffered from bipolar disorder, attention deficit hyperactivity disorder, predominate hyperactive impulse,

and cognitive disorder. Dr. Price incorporated Dr. Harvey's observations, including Weisheit's manic episode, into his testimony.

The Indiana Supreme Court found no deficiency in counsel's misunderstanding of Dr. Harvey's availability and no prejudice based on Dr. Price's ability to capably testify. We need not evaluate the court's deficiency determination because Weisheit has not shown that the court's no-prejudice finding was unreasonable. *See Strickland*, 466 U.S. at 697 (explaining that courts need not "address both components of the [ineffective assistance of counsel] inquiry if the defendant makes an insufficient showing on one"). Dr. Price testified that Weisheit suffered from bipolar disorder, just as Dr. Harvey would have. He based this testimony not only on his own observations and tests, but on a review of Dr. Harvey's report.

Rather than identify evidence absent from Dr. Price's testimony that Dr. Harvey would have introduced, Weisheit argues that Dr. Harvey would have more effectively rebutted the State's argument that Weisheit was not manic. The Indiana Supreme Court rejected this argument, concluding that "even without Dr. Harvey's testimony about the instance of mania he observed, trial counsel did in fact present evidence of Weisheit's bipolar diagnosis and possible mania at the time of the murders." *Weisheit II*, 109 N.E.3d at 986.

Weisheit fails to persuade us that such a conclusion was unreasonable. *Wiggins*, the only case that Weisheit cites, simply establishes that habeas courts reweigh the aggravating evidence against the totality of mitigating evidence. 539 U.S. at 534. A fair reading of the Indiana Supreme Court's opinion shows that it did just that. *See Weisheit II*, 109 N.E.3d at 986.

Dr. Gur, for his part, became involved in Weisheit's case at the postconviction stage. State postconviction counsel called him to testify about how the multiple brain injuries that Weisheit reported incurring in his childhood could have exacerbated his mental health conditions. Weisheit faults trial counsel for failing to develop and present evidence of his history of traumatic brain injury at the penalty phase of his trial.

The Indiana Supreme Court concluded that Weisheit failed to establish ineffective assistance, holding that Weisheit did not show prejudice. *Id.* at 987. The court reasoned that Dr. Gur's testimony was merely speculative and that speculative nature, together with testimony from the State's expert witness, would have minimized any mitigating effect of Dr. Gur's testimony.

Weisheit challenges the supreme court's "speculative" finding as an unreasonable determination of fact. But he has failed to show that such a conclusion was unreasonable given the evidence in the record.

Dr. Gur testified, based on his review of Weisheit's records (and never having met Weisheit), that Weisheit likely suffered instances of traumatic brain injury causing long-term effects. Medical records corroborated some of these injuries, others Weisheit self-reported. None of the incidents were corroborated by testing for brain injuries—without which, according to the State's expert, it was impossible to determine which instances caused permanent damage and which did not. Dr. Gur himself acknowledged that just because someone hit his head, even multiple times, does not necessarily mean he suffered from concussions, or in turn that the concussions caused permanent brain injury.

Under AEDPA's deferential review standard, that some evidence in the record supported Dr. Gur's testimony is not enough. The fact that both the Indiana Supreme Court's and Weisheit's interpretations "are at least plausible precludes us from displacing the state court's factual determination at the habeas stage." *Pierce*, 93 F.4th at 1046; *see also Wood*, 558 U.S. at 301 ("[E]ven if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." (citation modified)).

As for the Indiana Supreme Court's reliance on conflicting testimony from the State's expert to conclude that Dr. Gur's testimony would have made no difference, clearly established Supreme Court law does require courts to reasonably account for mitigation evidence, even if the State identifies "perceived problems" with such evidence. *Porter v. McCollum*, 558 U.S. 30, 43 (2009) (per curiam). By the same token, though, controlling law mandates consideration of *all* evidence, which includes rebuttal evidence. *Belmontes*, 558 U.S. at 20.

*Porter*, the only clearly established federal law Weisheit identifies in support of his challenge, elucidates this point. In *Porter*, defense counsel presented only one witness during the penalty phase of trial and the sentencing judge heard "absolutely [no]" evidence about the defendant's abusive childhood, his heroic military service and resultant trauma, or his impaired mental capacity. 558 U.S. at 33, 41. Comparing this "significant mitigation evidence" to the less substantial evidence in aggravation, the Supreme Court concluded that the state court unreasonably applied *Strickland*'s prejudice prong, ignoring "too much mitigating evidence." *Id.* at 31, 44.

Weisheit's case starkly contrasts with Porter's. The jury and sentencing judge heard substantial evidence of Weisheit's background, including his history of mental health issues. Meanwhile, the aggravating evidence against Weisheit, including his gruesome murder of two children, was overwhelming. The Indiana Supreme Court reasonably considered the effect of the additional mitigation evidence—inconclusive and uncorroborated—against the significant aggravating evidence in finding no prejudice. *See Belmontes*, 558 U.S. at 27–28 ("It is hard to imagine expert testimony and *additional* facts about [the petitioner's background] outweighing the facts of … [the] murder[s].").

### c. Fire Testimony

We turn next to trial testimony regarding the cause of the fire. Recall, Assistant Chief Bretz and Fire Marshal Kinder testified that the house fire was intentionally set. Detective Blessinger testified that Weisheit himself set it.

The Indiana Supreme Court concluded that counsel did not perform deficiently in failing to object to the testimony of Bretz and Kinder because it was admissible under Indiana rules of evidence. *Weisheit II*, 109 N.E.3d at 991. We will not disturb this admissibility determination. *McGuire*, 502 U.S. at 67–68. As for Blessinger's testimony, the court explained that even if counsel provided deficient performance, Weisheit did not show prejudice. We evaluate the court's prejudice determination and discern no misapplication of clearly established federal law.

Citing the decision of the initial postconviction review court, which recounted evidence indicative of Weisheit's guilt, the Indiana Supreme Court concluded that the expert

testimony "was not nearly as persuasive as Weisheit's actions before, during, and after the crime." *Weisheit II*, 109 N.E.3d at 991–92 (citation modified). The court detailed these actions on direct appeal, including:

- Months before the fire, Weisheit told a co-worker that if Lynch was having an affair, as he suspected, he would "kill her, burn everything, and kill his self";

- Weeks or days before the fire, Weisheit canceled payments on the engagement ring for Lynch, told the jeweler he was leaving the country, quit his job, and withdrew all the money in his bank account;

- The night of the fire, Weisheit tied Caleb up and taped a rag into his mouth, left the children alone, fled Indiana, did not respond to numerous calls, attempted to evade police, and implored officers to shoot him;

- When officers finally secured him, they found cash, clothes, and Lynch's jewelry in his possession;

- At the hospital, Weisheit selectively answered questions from the police about the children and the fire; and

- Rescuers found Caleb with flares around his body—flares that Weisheit brought into the home.

*Weisheit I*, 26 N.E.3d at 11–12.

The Indiana Supreme Court properly weighed the potential exclusion of the fire witnesses' testimony against the overwhelming evidence of Weisheit's guilt, as required by clearly established law. *See Belmontes*, 558 U.S. at 20; *Williams*, 529 U.S. at 397–98. That it did so in only a few words does not undermine our conclusion. *See Johnson v. Williams*, 568 U.S. 289, 300 (2013) ("federal courts have no authority to impose mandatory opinion-writing standards on state courts"); *Dassey*, 877 F.3d at 314 (dismissing the petitioner's criticism of the "terse" state court opinion where the court "endorsed detailed findings by the trial court that provide[d] substantial support" for its conclusion).[11]

### d. Failure to Make an Offer of Proof

We end by returning to the testimony of James Aiken. Weisheit alleges ineffective assistance based on counsel's failure to point the trial court to the correct Indiana rule of evidence under which Aiken would have qualified as an expert (Rule 702(*a*)),[12] along with counsel's failure to make an

---

[11] Weisheit separately faults the Indiana Supreme Court for not considering the prejudicial effect of counsel's performance at the penalty phase of proceedings. In Weisheit's case, this is a distinction without a difference; the challenged testimony, presented during the guilt phase, did not impart any new prejudicial information at the penalty phase. The jury was clearly satisfied that Weisheit intentionally set the fire and imposed his sentence based on that understanding. Because no prejudice resulted at the guilt phase, Weisheit has not established a reasonable probability that absent the fire witnesses' testimony, at least one juror would have voted against death at the penalty phase. *See Wiggins*, 539 U.S. at 537.

[12] Indiana Rule of Evidence 702(a) permits the testimony of "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education … if the expert's scientific, technical, or other specialized

adequate offer of proof. Ind. R. Evid. 103(a)(2) (requiring a party to inform the court of the substance of excluded evidence by an offer of proof).

We do not decide whether Weisheit established deficient performance because the Indiana Supreme Court did not unreasonably apply *Strickland* in finding no prejudice. The court rested its holding on two grounds. First, under any rule of evidence, the admissibility of Aiken's testimony was "speculative." *Weisheit II*, 109 N.E.3d at 988. The Indiana Supreme Court outlined a handful of reasons, including Aiken's limited study of Weisheit's record, the inconsiderable amount of time he spent interviewing Weisheit, his difficulty addressing the trial court's questions about his experience and preparation, and his admission that he did not review any information regarding how an Indiana prison would house an inmate convicted of murdering children. *Id.* Once again, we do not second-guess a state court's application of its own rules of evidence. *McGuire*, 502 U.S. at 67–68.

The Indiana Supreme Court also reasoned that Aiken's testimony would have opened the door to Weisheit's voluminous disciplinary records. Weisheit accrued 35 incident reports during his pretrial incarceration between April 2010 and May 2011. The reports depicted, among other incidents, his threat to kill an EMT worker, threats to officers and other inmates, destruction of jail property, and concealment of

---

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Unlike Rule 702(b), it does not require testimony based "upon reliable scientific principles."

"multiple, sharp chicken bones" in his mouth. *Weisheit II*, 109
N.E.3d at 988 (citation omitted).[13]

As we have indicated, when evaluating prejudice, courts
must consider "not just the mitigation evidence[,]" but any
and all evidence that "would have come in with it." *Belmontes*,
558 U.S. at 20–24. That is precisely how the Indiana Supreme
Court proceeded. Weisheit does not dispute the court's inter-
pretation of his disciplinary reports, nor its determination
that the State would have introduced them to challenge Ai-
ken's opinions. Given the speculative nature of Aiken's testi-
mony and the likelihood that it would have triggered the in-
troduction of powerful counterevidence, the Indiana Su-
preme Court reasonably determined that Weisheit did not
suffer prejudice from the absence of Aiken's testimony. *See id.*
(concluding that the petitioner did not establish prejudice
where the sought "expert testimony discussing [the peti-
tioner's] mental state, seeking to explain his behavior, or put-
ting it in some favorable context would have exposed" the
jury to powerful rebuttal evidence); *cf. Darden v. Wainwright*,
477 U.S. 168, 186 (1986) (declining to find deficient perfor-
mance where "[a]ny attempt to portray petitioner as a nonvi-
olent man would have opened the door for the State to rebut
with evidence of petitioner's prior convictions").

---

[13] Weisheit attempts to challenge the significance of this evidence with
conclusory statements that "some" evidence of his "erratic behavior" was
already in the record through Dr. Price's testimony. Having failed to ar-
ticulate the character of this evidence from Dr. Price or the extent of any
overlap, however, we are not persuaded.

*       *       *

To summarize: the Indiana Supreme Court did not unreasonably apply *Strickland* when it concluded that Weisheit failed to establish ineffective assistance of counsel, so he is not entitled to habeas relief on these claims.

### III. Conclusion

We observed at the outset that AEDPA intentionally presents a difficult standard for petitioners to meet. Weisheit has not carried his burden to meet it. For that reason, and because we agree with the district court's related de novo and discretionary decisions, we AFFIRM the district court's judgment.